Ariel J. **BANKERT,** an Infant by her Mother and Next Friend Kimberly **BANKERT** and Kimberly Bankert, Individually, Plaintiffs,

v.

**UNITED STATES of America, Defendant.**

**Civil Action No. AW–94–2277.**

United States District Court,
D. Maryland.

Aug. 27, 1996.

**16.** A remand with instructions to dismiss is justified only when further proceedings would be pointless, such as when the issue is moot, *see, e.g., United States v. Munsingwear, Inc.,* 340 U.S. 36, 39–40, 71 S.Ct. 104, 106–107, 95 L.Ed. 36 (1950), or the question is nonjusticiable, *see, e.g., Renne v. Geary,* 501 U.S. 312, 315, 111 S.Ct. 2331, 2335–2336, 115 L.Ed.2d 288 (1991); *Taylor Inv. Ltd. v. Upper Darby Tp.,* 983 F.2d 1285, 1295 (3d Cir.), *cert. denied,* 510 U.S. 914, 114 S.Ct. 304, 126 L.Ed.2d 252 (1993), or the court

does not have and never had subject matter jurisdiction, *see, e.g., National Labor Relations Bd. v. United Food and Commercial Workers Union, Local 23, AFL–CIO,* 484 U.S. 112, 133, 108 S.Ct. 413, 426, 98 L.Ed.2d 429 (1987), or the plaintiff fails to exhaust her administrative remedies, *see, e.g., Brown v. Fauver,* 819 F.2d 395, 397 (3d Cir.1987). No such or similar circumstance is present in this case. If the case is remanded, another judge could be appointed, and the case readily could be retried.

Kathleen Howard Meredith, Baltimore, MD, for plaintiffs.

Lynne A. Battaglia, United States Attorney, and James G. Warwick, Assistant United States Attorney, Baltimore, MD, for defendant.

## OPINION AND ORDER

WILLIAMS, District Judge.

This is an action filed by the Plaintiffs, the infant Ariel Bankert by her Mother and Next Friend Kimberly Bankert, and Kimberly Bankert, individually, pursuant to the Federal Tort Claims Act, 28 U.S.C. § 1346(b) and §§ 2671–2680. Jurisdiction is invoked under 28 U.S.C. § 1346(b). Venue is proper in the United States District Court for the District of Maryland under 28 U.S.C. § 1402(b), as both Plaintiffs reside within the judicial district of Maryland and the acts and omissions complained of occurred within the judicial district of Maryland. Plaintiffs satisfied the administrative prerequisites before filing the action and the matter proceeded to trial before this member of the Court.

## I. FINDINGS OF FACT

Based on the evidence received at the six (6) day non-jury trial held on July 2, 3, 8, 9, 10, and 11, 1996, the Court finds that the following facts have been established:

1. In June 1991, Kimberly Bankert was seen at Malcolm Grow Medical Center, a hospital and clinic complex run by the United States Air Force and located on Andrews Air Force Base. Kimberly Bankert was at that time married to and a dependent of Dennis Bankert, a Sergeant on active duty for the United States Air Force. A pregnancy test performed at that time confirmed that Kimberly Bankert was pregnant with her third child.

2. Kimberly Bankert had given birth to two previous children *via* cesarean section. The first section was performed on an emergency basis for fetal distress in 1987 while the second was an elective repeat cesarean section in June of 1988. The cesarean section for fetal distress in connection with Kimberly Bankert's first delivery was a bad and traumatic experience for both Kimberly and Dennis Bankert.

3. When Mrs. Bankert became pregnant in 1991, she was under the care of Dr. Carol Rupe of the Family Practice Service at Malcolm Grow. Mrs. Bankert felt comfortable with Dr. Rupe and wished Dr. Rupe to follow her in her pregnancy.

4. In the 1960's and 1970's, any woman who delivered a baby by cesarean section was told she would have to have a cesarean section in connection with any subsequent pregnancy; in other words, the rule was "once a cesarean section, always a cesarean section."

5. Beginning in the 1980's, however, research indicated that many women who had previous cesarean sections could achieve successful vaginal deliveries if allowed a trial of labor. A successful vaginal delivery after a previous cesarean section is called a "VBAC" for vaginal birth after cesarean section.

6. There are certain risks associated with attempts at vaginal birth after cesarean section.

7. The most frequently occurring risk is the risk of failure.

8. The most serious risk of an attempt at vaginal birth after cesarean section is the risk of uterine rupture and its consequences. Uterine rupture is a risk of VBAC because once the uterine wall has been weakened by a previous surgical incision, there is an increased risk that the uterine wall will rupture under the stress of labor contractions.

9. Uterine rupture is an emergency situation of the gravest nature that can result in fetal brain damage, maternal hysterectomy and maternal and/or fetal death. Because of the catastrophic nature of the risks associated with uterine rupture, and despite the fact that the risk of uterine rupture is relatively small, the medical profession recognizes two equally acceptable approaches to the management of a patient with a history of prior cesarean section delivery: the first is to deliver the patient by repeat cesarean section and the second is to allow a trial of labor.

■ 10. The doctrine of informed consent imposes on a physician, before he/she subjects his/her patient to medical treatment, the duty to explain the procedure to the patient and to warn her of any material risks or dangers inherent in or collateral to the proposed therapy, so as to enable the patient to make an intelligent and informed choice about whether to follow her physician's recommendation or to select some other medically acceptable treatment alternative.

■ 11. Informed consent is defined as **"the willing and uncoerced acceptance"** of a medical intervention by a patient after adequate disclosure by the physician of the nature of the intervention, its risks and benefits, as well as of alternatives with their risks and benefits.

■ 12. Where there are two or more medically acceptable treatment approaches to a particular medical problem, the informed consent doctrine, medical ethics, and the standard of care all provide that the competent patient has the absolute right to select from among these treatment options after being informed of the relative risks and benefits of each approach.

■ 13. The informed consent doctrine holds that a physician has a legal, ethical and moral duty to respect patient autonomy and to provide only authorized medical treatment. Under the informed consent doctrine, a physician has an obligation to inform his/her patient of the potential risks of all medically acceptable treatment alternatives and the additional obligation to allow his/her patient to make a decision as to which of the medically acceptable treatment alternatives she is going to pursue.

■ 14. The corollary to this rule is that it is unethical and below the applicable standard of care for a physician to pursue a treatment alternative other than the one to which his patient has given consent. Unless a patient consents to a treatment approach recommended by her physician, the physician may not proceed with that approach even if the physician personally believes his/her recommended approach to be in his patient's best interests.

■ 15. A competent patient's right to select from among medically acceptable treatment alternatives also encompasses the right to change one's mind about the treat-

ment approach selected. A competent patient who has had two prior cesarean sections has the right to consent or withhold consent to a trial of labor. There is nothing about pregnancy or the onset of the labor process which automatically renders a woman incapable of rational thought or unable to participate in competent decision making.

16. Dr. Rupe advised Kimberly Bankert that as a Family Practice physician, she was not credentialed to perform cesarean section deliveries and could follow Kimberly only if she agreed to a trial of labor. Mrs. Bankert expressed to Dr. Rupe an interest in attempting a vaginal delivery of her third child. Dr. Rupe then referred Mrs. Bankert to the Obstetrics Department for a consultation.

■ 17. In 1991, unbeknownst to Kimberly Bankert, the Obstetrics and Gynecology Department at Malcolm Grow Hospital had in effect a so-called "unanimous policy regarding trial of labor patients" which was repugnant to accepted principles of informed consent. The policy was that trial of labor candidates would be counseled regarding their options in terms of mode of delivery, the relative risks, benefits, advantages, and disadvantages of each. The patients would be permitted to select from the two medically acceptable modes of delivery and their choice in this regard would be honored. The patients would be free to change their minds about the mode of delivery selected up until the point they entered labor. Once a patient who had elected to attempt a trial of labor began the labor process, however, the unwritten, unanimous policy provided that "the patient would be required to labor **no matter what** and cesarean section would be performed by the doctor only if he in his sole judgment determined that there was medical or obstetrical indication." [1]

18. On June 27, 1991, Kimberly Bankert saw Dr. Ronette Cyka of the Department of Obstetrics and Gynecology. Dr. Cyka advised that many women who have undergone past cesarean sections are able to deliver vaginally.

19. Dr. Cyka further advised Kimberly Bankert that many women change their minds about the trial of labor option once they enter labor **because of pain.** Dr. Cyka advised Kimberly Bankert that once she entered labor, Kimberly would not be permitted to change her mind **for reasons of pain.** Dr. Cyka did not advise Kimberly Bankert of the unwritten, unanimous policy adopted by the Malcolm Grow Department of Obstetrics and Gynecology during the pertinent time frame which prohibited VBAC patients from withdrawing consent to the trial of labor **under all circumstances** once labor began, and which further provided that once labor began, the decision to perform cesarean section would be up to the obstetrician and the obstetrician alone.

20. After consultation with Dr. Cyka, Kimberly Bankert opted to proceed with a trial of labor (VBAC, or vaginal birth after cesarean section).

21. Kimberly Bankert's pregnancy was healthy and uncomplicated as she remained under the care of the Family Practice physician, Dr. Carol Rupe.

22. On January 22, 1992, Mrs. Bankert presented to the Labor and Delivery Suite at Malcolm Grow Medical Center at approximately 2:15 a.m.—3:00 a.m. Her membranes had ruptured around 1:30 a.m. and she was experiencing contractions. Mrs. Bankert was accompanied by her husband, Dennis Bankert. After being admitted, Mrs. Bankert reaffirmed her desire to undergo a trial of labor by executing a patient's Informed Consent to proceed toward vaginal delivery.

23. On duty with the Family Practice Service was Mrs. Bankert's physician, Dr. Rupe and Dr. Kerr, a third year resident, who looked in on and covered for Dr. Rupe between approximately noon and 5:00 p.m. when Dr. Rupe assumed her duties at the acute care clinic.

24. Dr. James Nelson was the obstetrician covering the labor and delivery floor on January 22, 1992. His role in caring for Family Practice patients admitted to the la-

---

**1.** This finding is not particularly pertinent in light of testimony by the obstetrician that he did not consider the policy as a basis for his actions.

bor and delivery floor was to serve as a consultant to the Family Practice physicians, to be available should any high risk issues arise, and to perform cesarean section delivery should the need arise.

25. When Dr. Nelson came on duty at 7:00 a.m. on January 22, 1992, he was advised that Mrs. Bankert had been admitted to the Family Practice Service for a trial of labor after two prior cesarean sections. By virtue of Kimberly Bankert's history of two prior cesarean sections, Dr. Nelson concluded that she was at that point an intermediate risk patient.

26. Dr. Nelson did not examine or evaluate Kimberly Bankert at or around the time he received a report on her.

27. Although Kimberly Bankert labored from 1:30 a.m. to approximately 11:00 a.m., she failed to make significant progress toward delivery. Sometime after 11:00 a.m., the Family Practice Physicians attending Kimberly Bankert consulted with Dr. Nelson about the patient's failure to progress in labor. Between the hours of 1:00 p.m. and 5:00 p.m. Mrs. Bankert was given intra-partum interventions consisting of fluids, position changes and oxygen.

28. During that time, Dr. Nelson authorized the administration of a medication known as pitocin, a drug designed to bring on active labor, and to enhance the strength, duration and frequency of the uterine contractions of labor.

29. Because the administration of pitocin to a patient attempting vaginal birth after cesarean section elevates the risk of uterine rupture, hospital protocol required the Family Practice Physician to consult with and obtain approval from Dr. Nelson before administering the medication. Dr. Nelson did not personally examine or evaluate Kimberly Bankert before authorizing the use of pitocin.

30. The use of pitocin in a laboring VBAC patient increases the risk of uterine rupture and also creates the risk of fetal distress.

31. The Court finds that it was the policy, practice and procedure at Malcolm Grow Hospital as well as standard care for the attending physician to explain the risks and benefits of pitocin in order to obtain the patient's informed consent for use of the medication.

32. Prior to administering the pitocin, Malcolm Grow personnel did not advise Kimberly Bankert or her husband of the risks of this medication and, in particular, did not advise that use of the medication would further increase the risk of uterine rupture.[2]

33. The use of pitocin brought on strong and active labor contractions which significantly contributed to and more probably caused Kimberly Bankert's uterus to rupture.

34. Beginning at about noon on January 22, 1992, Malcolm Grow personnel began to express concerns to each other and to Kimberly and Dennis Bankert about the welfare of the unborn baby.

35. At 1:45 p.m., for example, both the long term and short term variability on the fetal heart monitor were described as absent and a nursing note described "a deep variable deceleration with a questionable late component."

36. At 2:35 p.m., Dr. Kerr wrote a note which stated: "subtle decelerations noted starting at 12:40 p.m. which progressed to mild and then to moderate variable decelerations but which resolved with changes in position, oxygen and increased fluids. Some decrease in beat to beat variability also noted. Now with occasional mild to moderate variable decelerations." Dr. Kerr's assessment was "slow progress, possible early evidence of fetal distress."

37. The term "fetal distress" refers to a precarious fetal condition that, allowed to persist, may lead to permanent damage or perinatal death. By definition, fetal distress is an emergency situation. The appropriate and required clinical response to sustained true fetal distress is prompt and immediate

---

2. While Dr. Rupe in her deposition initially did not recall whether she discussed the risks and benefits with the Bankerts prior to the administering of pitocin, she testified at trial that after thinking about it, she now knows she discussed it with Mrs. Bankert. The court, however, accepts the testimony of Mrs. Bankert that she was not consulted.

delivery of the infant, if necessary, by emergency or stat cesarean section.

38. There can be abnormalities in fetal heart rate apparent on a fetal heart tracing which, though not clearly diagnostic of fetal distress, raise concerns about fetal well being. These abnormalities may or may not progress to true fetal distress. The usual clinical response to these early abnormalities is to give the mother oxygen, to increase her intravenous fluids, and to change her position.

39. The interventions employed by staff between noon and 3:00 p.m., *i.e.* the positional changes, the oxygen, the increase in IV fluids, were not new to Kimberly Bankert and her husband, Dennis Bankert. They had seen them used unsuccessfully in connection with Kimberly's first labor which had ultimately resulted in the emergency cesarean section for fetal distress.

40. By 3:00 p.m., Kimberly had been in labor over twelve hours and was still only four centimeters dilated. She and her husband believed that any vaginal delivery was many hours off. They were worried about their baby because of the comments and actions of hospital personnel and because of their own understanding as to the significance of the clinical interventions designed to resolve the early fetal heart rate abnormalities. They began to doubt whether Kimberly Bankert could successfully give birth by labor. If unsuccessful, they feared labor would have to be terminated by a stat cesarean section for fetal distress or other emergency, something they had been through before and wished to avoid.

41. Because of these concerns, they told their labor and delivery nurse, Penny Davis, that they wished to see the doctor in order to request a cesarean section. It was clear to Penny Davis from the tone and content of Kimberly Bankert's remarks that she wanted to terminate the trial of labor and to have a cesarean section.

42. At the time Kimberly and Dennis Bankert made their decision to withdraw consent to the trial of labor and to pursue cesarean section, there was nothing about this patient that deprived her of the capacity to consent or withhold consent to the two treatment alternatives for her delivery.

43. At approximately 3:30 p.m., Dr. Kerr responded to the patient's room where Mr. and Mrs. Bankert reiterated their request for cesarean section. Though Dr. Kerr attempted to reassure Mr. and Mrs. Bankert, they were adamant in their request for cesarean section because of their concern for their unborn infant, the slow progress Kimberly had made in labor, their awareness that the trial of labor might not be successful, and their desire to avoid an emergency surgical delivery. Dennis Bankert specifically challenged Dr. Kerr when she advised that the baby was fine and that there was no medical reason at that time for a cesarean section.

44. Ordinarily Dr. Kerr would have dealt with a request by a laboring VBAC patient for cesarean section on her own and without involving the attending obstetrician. She would ordinarily summon the obstetrician only where she felt there was a medical or obstetrical indication for cesarean section or where the patient was being particularly insistent about her request.

45. Dr. Kerr did not see an obstetrical indication for cesarean section when she summoned Dr. Nelson to deal with the Bankerts' request for cesarean section. Dr. Kerr approached Dr. Nelson and advised him that Kimberly Bankert and her husband had requested a cesarean section delivery. Dr. Kerr explained that Mrs. Bankert and her husband had been expressing concerns about the welfare of their unborn infant and wished to have a cesarean section.

46. Dr. Nelson responded to the patient's room at approximately 3:45 p.m. He performed a pelvic exam and reviewed the fetal heart rate tracing in an effort to identify evidence of fetal distress.

47. Dr. Nelson's review and interpretation of the tracings did not reveal true fetal distress as that term is medically defined. Dr. Nelson's pelvic exam revealed that Kimberly Bankert was only 5–6 centimeters di-

lated with the baby's head at the 0 to −1 station.[3]

48. Dennis Bankert reiterated to Dr. Nelson the request for cesarean section. Although Dr. Nelson could not recall how many times Dennis Bankert requested cesarean section he does recall that he was clearly aware that Dennis and Kimberly wanted a cesarean section.

49. Dr. Nelson responded by stating that the baby was doing fine, labor was progressing, and there was in his judgment no "medical indication" for cesarean section at that time. Dr. Nelson offered medication to help alleviate Mrs. Bankert's pain and conveyed to them that in his best opinion, they should proceed with the trial of labor.

50. Nurse Penny Davis was sent from the room to obtain the pain medication which Dr. Nelson had ordered. Dr. Nelson remained in the room with Dennis and Kimberly Bankert.

51. Dr. Nelson was a Major in the United States Air Force, as opposed to Kimberly Bankert's husband, Dennis Bankert, who held the rank of Sergeant.

52. As a career military man, Dennis Bankert was respectful for the chain of military authority, and therefore was somewhat reluctant to openly question or challenge the directions of a senior officer.

53. Despite the fact that Dr. Nelson outranked him, Dennis Bankert who along with Mrs. Bankert was very worried about their baby and, possibly, angry and upset, specifically challenged Dr. Nelson's evaluation of the situation and in Dr. Nelson's words became "a little belligerent."

54. Although Dr. Nelson's next response is highly disputed, the Court accepts the testimony of Dennis and Kimberly Bankert that Dr. Nelson raised his voice, shook his finger at Dennis Bankert, and said words to the effect of: "First of all, I am the doctor, you're not, and I'm the one who decides

whether or not she gets a c-section, not you! Secondly, we have a pact with her." [4]

55. At that point, Dennis and Kimberly Bankert remained silent or in the words of Dr. Nelson, Dennis Bankert "backed off", and did not press the issue anymore.

56. Penny Davis re-entered the room after obtaining the pain medication and proceeded to administer the pain medication in accordance with Dr. Nelson's previous order.

57. Sometime around 4:00 p.m., Kimberly Bankert called her friend, Jan Rule, advising Mrs. Rule that she (Kimberly) was mad. Kimberly Bankert also advised Mrs. Rule that Dr. Nelson had refused her request for cesarean section, that "he wouldn't even consider a c-section", that he had yelled at her and her husband and told them that they "would not get a cesarean section, because he was the doctor."

58. Dr. Rupe entered the labor room sometime after 5:10 p.m., and Kimberly and Dennis Bankert asked why they had been denied their request for cesarean section. Kimberly Bankert also complained to Dr. Rupe, that Dr. Nelson had been rude, curt and abrupt in denying her and her husband their requested cesarean section. Dr. Rupe indicated that "her hands were tied" and the decision was Dr. Nelson's alone.

59. At approximately 6:30 p.m., Kimberly experienced a tearing sensation in her abdomen that "felt like the baby was coming out through the side." Labor and delivery nurse Penny Davis, believing the patient's complaint of increased pain to be a sign that she might be fully dilated, left the room, contacted Dr. Rupe and received permission from Dr. Rupe to perform a vaginal examination.

60. Upon return to the patient's room at 6:32 p.m., Penny Davis performed her vaginal examination, noted a bloody discharge from Mrs. Bankert's vagina, and assessed the patient at 9 centimeters of dilation. At about the same time, she noted that the unborn baby had developed a severe bradycardia or

---

**3.** Before a vaginal delivery can occur, the patient must achieve 10 centimeters of dilation.

**4.** As noted earlier, the alleged statement about a pact is not particularly relevant inasmuch as Dr.

Nelson took the position in his testimony that the unwritten policy was not a factor in his decision to continue with labor.

slowing of the heart rate and that the heart rate did not increase when she scratched the fetal head.

61. Nurse Penny Davis summoned Dr. Rupe to bedside. Dr. Rupe arrived at bedside within seconds of the onset of the fetal bradycardia. Dr. Rupe performed a vaginal examination and erroneously assessed the patient at 10 centimeters of dilation, and requested, the staff to set up for a vaginal delivery.

62. Dr. Rupe recognized immediately upon arrival at bedside that she had an emergency situation on her hands, that the baby was in fetal distress, and that she was in need of assistance. She wanted Dr. Nelson notified and summoned there as soon as possible.

63. Dr. Rupe testified that she immediately issued an order to Nurse Penny Davis to stat page Dr. Nelson.[5] Penny Davis testified that she does not recall an order for a stat page. The Court finds that Dr. Rupe never issued an order for a stat or emergency page, but rather requested only that Dr. Nelson be called or paged.[6]

64. Dr. Nelson arrived at bedside at approximately thirteen to sixteen minutes after the onset of the bradycardia and approximately thirteen to fifteen minutes after he was first paged.

65. Upon arriving in the labor room, Dr. Nelson quickly assessed the situation, determined that the cervix was not fully dilated and recognized that an emergency cesarean section was required. Dr. Nelson then ordered preparations for an emergency cesarean section delivery.

66. An emergency cesarean section was performed under general anesthesia and Ariel Bankert was delivered at 6:59 p.m.

67. Upon incising Kimberly Bankert's abdomen, Dr. Nelson identified a large amount of blood, and also observed that the baby's head was protruding through a rupture of the uterine wall into the abdomen. Dr. Nelson turned the baby, Ariel Bankert, over to the Family Practice Physicians who were assisting in the delivery.

68. At delivery, Ariel was floppy and anoxic with APGAR scores of 1 at one minute, and 1 at five minutes.[7] The only sign of life in Ariel Bankert at one and five minutes of age was a depressed heart rate.

69. At birth, Ariel's diagnosis was anoxic episode secondary to uterine rupture and maternal hemorrhage. Suffering from asphyxia and severe acidosis, Ariel required emergency neonatal resuscitation. Because of the lack of contemporaneous records having been created or maintained, however, the Court is unable to precisely determine the efficacy of the neonatal resuscitation effort.[8]

70. Several unsuccessful attempts at intubation prolonged the period of less than optimal oxygenation to the infant.

71. A chest x-ray was taken of Ariel Bankert at approximately 8:30 p.m. when she was one and one half hours of age. The chest x-ray was misinterpreted as normal by

5. Stat pages are designed to be used in cases of emergency and to communicate to a physician that he or she respond immediately and urgently to the page.

6. Dr. Nelson testified that he never received a stat page to Kimberly Bankert's room. He testified that he "was up doing a consultation on the surgery floor at the other end of the hospital ... and I got just a page, 'Dr. Nelson please call labor and delivery.' " It was not urgent in **any way.** It just said, 'Please call labor and delivery.' I was in the middle of a discussion with a general surgeon at that time, and so we finished the topic that we were talking about and I called labor and delivery. At that time I talked with one of the technicians who answered the phone. I said, 'This is Dr. Nelson. I have been paged to call labor and delivery.' He said, 'I was not

aware that you had been paged.' I said, 'please find out what's going on,' and he put me on hold. It was probably at **least** two to three minutes later when Dr. Rupe picked up the phone, said 'Jim, I need you here right now,' or something to that extent. I said, 'fine. I'll be right down,' and I jogged down to labor and delivery. **Until Dr. Rupe actually got on the phone,** I had not received any indication that it was an emergency.

7. The APGAR score of 1 out of a potential 10 points indicates that at birth and again by five minutes of age, Ariel was making no respiratory effort, had no color, no tone, and no reflexes.

8. The APGAR scores of 1 at one minute and 1 at five minutes, however, indicate that Ariel Bankert was not being adequately or effectively ventilated in the period immediately following birth.

the Family Practice Physicians attending Ariel. The chest x-ray in fact showed a right sided tension pneumothorax which is a collection of air between the chest wall and the lung. The chest x-ray further demonstrated that the pneumothorax was sufficiently large to displace the heart and other structures in the chest and to prevent the right lung from properly expanding.[9]

72. At approximately 9:30 p.m., a neonatal transport team arrived from Bethesda Naval Hospital. The previously taken chest films were again reviewed and it was at this point that the right-sided pneumothorax was diagnosed. The pneumothorax was treated by the insertion of a chest tube which released the collection of air in the chest and allowed the lung to fully and properly expand.

73. The Court finds that the delay in diagnosing and treating the pneumothorax further interfered with optimal oxygenation to Ariel and further compromised and exacerbated her condition, though it is impossible to determine what percentage of her current injury would have been avoided had the pneumothorax been promptly diagnosed and treated.

74. During the time that Ariel Bankert was being resuscitated, Dr. Nelson was performing surgery on Kimberly Bankert. Because of the size and location of the uterine rupture, (along the side wall) Dr. Nelson performed a hysterectomy. During the surgery, Dr. Nelson removed Kimberly Bankert's uterus, as well as her left ovary and fallopian tube. There is no suggestion whatsoever that Dr. Nelson's decision to perform a hysterectomy at this point was anything less than appropriate.

75. Because of the large volume of blood loss, Kimberly Bankert was transfused with three units of blood.

76. Ariel has experienced developmental delays after birth. The Court finds that Ariel suffers from a form of cerebral palsy. Consistent with this diagnosis, Ariel suffers from right-sided hemiplegia and from a developmental language delay. The Court finds that Ariel's cerebral palsy was primarily caused by a deprivation of oxygen during the period between the rupture of Mrs. Bankert's uterus and the delivery of the child by Dr. Nelson.

77. Ariel Bankert is now four years of age. She is not as agile as other children, has some difficulty with her balance and with going up and down steps. She has difficulty with fine motor skills (particularly on the right side), and has delay in the development of her language skills. Her ability to understand is better than her ability to communicate. Ariel's intelligence is in the low range of average. Ariel is also "at risk" for the development of learning disabilities and/or other problems (e.g.—executive functioning).

78. The physical and neurological impairment described above were proximately related to the global anoxic/hypoxic brain injuries.

79. Ariel has undergone several neuropsychological and developmental evaluations and other testing to determine the appropriate therapeutic program to address her difficulties. She has received physical therapy, educational and developmental services with the Prince George's County School System since April 1993, in an effort to improve her language, cognitive, motor, and adaptive skills. She has also attended sessions at the Wately Special Center, the P.G. Community College, and the University of Maryland clinics for their intervention services to meet her needs.

80. The Court finds that the various intervention services employed over the years have resulted in some improvement of Ariel's motor, cognitive, and language deficiencies, however, more services at this time are required in order to maximize Ariel's potential, and to assist her in overcoming her difficulties.

81. At the request of Kimberly and Dennis Bankert (the parents of Ariel), the educational services provided by the Prince George's County School System have been

---

9. A pneumothorax of this size also causes a compromise in blood flow back to the heart and thus further impairs ventilation and circulation.

terminated. The parents prefer to "home school" Ariel as they do with their other three children.[10] Ariel does, however, attend the school (Wheatley Special Center) two days per week for speech and motor skills.

82. While Ariel is "at risk" for the development of a learning disability or problems with executive functioning, there is no present evidence of such disabilities.

83. It is undisputed that had Dr. Nelson honored Kimberly and Dennis Bankert's request for cesarean section when asked to do so at approximately 3:45 p.m. on January 22, 1992, Kimberly Bankert never would have experienced a uterine rupture, and would never have been required to undergo an emergency hysterectomy, and would not have lost her ability to bear children.

84. As testified to by several experts, had Dr. Nelson honored Kimberly and Dennis Bankert's request for cesarean section when asked to do so at approximately 3:45 p.m. on January 22, 1992, Ariel Bankert would have been born without incident, and without the brain damage and other disabilities from which she suffers today.

## II. CONCLUSIONS OF LAW

### A. Generally

1. Plaintiffs bring this action pursuant to the Federal Tort Claims Act, hereinafter FTCA, 28 U.S.C. § 2671, et seq. Under Section 2674 of the FTCA, the United States is liable to the same extent as an individual in similar circumstances, except that the United States is not liable for prejudgment interest or punitive damages. The Court is to apply the substantive law of the place where the allegedly negligent or wrongful act or omission occurred. See 28 U.S.C. §§ 1346(b) and 2674. As such, the controlling law in this case is the law of Maryland. State law controls both as to liability and damages. United States v. Muniz, 374 U.S. 150, 153, 83 S.Ct. 1850, 1852–53, 10 L.Ed.2d 805 (1963); United States v. Streidel, 329 Md. 533, 535, 620 A.2d

905 (1933); Burke v. United States, 605 F.Supp. 981, 987 (D.Md.1985).

A physician has a duty under Maryland law to use that degree of care and skill which a reasonably competent physician, acting in the same or similar circumstances, would have used. Benson v. Mays, 245 Md. 632, 227 A.2d 220 (1967); Shilkret v. Annapolis Emerg. Hosp. Ass'n, 276 Md. 187, 349 A.2d 245 (1975). Failure to use the requisite degree of skill amounts to negligence. Whether the Defendant's conduct complied with the applicable standard of care is a question of fact to be determined by a review of all the evidence (including expert testimony).

The United States is vicariously liable and responsible for the conduct of all of its agents, servants and employees under the Federal Tort Claims Act and the applicable common law. Cox v. Prince George's County, 296 Md. 162, 460 A.2d 1038 (1983). Finally, several negligent acts may combine together to proximately cause harm.

### B. Kimberly L. Bankert's Negligence Claim

The Court believes that the defendant acting through its employees violated the applicable standards of care as to Kimberly L. Bankert. First, the Court finds that the defendant owed a duty, specifically, to advise Plaintiff, Kimberly L. Bankert, of the risks of pitocin augmentation prior to it having been administered in this case. Defendant argues that the infusion of pitocin to augment labor is an ordinary labor management step which does not require either an additional nor separate informed consent from the patient. The Court disagrees. There was testimony from several physicians including Dr. Nelson, the delivering obstetrician in this case, to the effect that the administration of pitocin elevates the risk of uterine rupture, and that it would have been standard hospital protocol at Malcolm Grow Hospital for the attending physicians to dis-

---

10. Kimberly Bankert expressed dissatisfaction with the educational program Ariel attended in the Prince George's County School System. The decision to home teach Ariel is contrary to the recommendation of the school intervention team which recommended more intense services based on the severity of the child's needs.

cuss the risks of pitocin with the patient before administering it. Dr. Rupe, the attending physician, stated at trial that after reflecting on her deposition testimony, she was now certain that she discussed the risks and benefits of pitocin with Kimberly L. Bankert. The Court, however, has no reason to question Kimberly Bankert's testimony that no such discussion took place. The Court, therefore, concludes that defendant breached the applicable prevailing standard of care by failing to advise Kimberly Bankert of the risk of pitocin augmentation.

■ *Second,* the Court believes that the defendant breached its duty owed to Kimberly Bankert by refusing her request for a repeat cesarean section shortly after 3:00 p.m. Kimberly Bankert was rational and unequivocal in her request for a cesarean section. She had been in labor for 12–14 hours with relatively minimal progress, she and her husband had observed clinical intervention measures being employed by the hospital staff to induce labor, and she had become very concerned about her baby. Moreover, Mrs. Bankert no longer believed she could succeed with a vaginal delivery, and she very much wanted to avoid an emergency cesarean delivery which brought back unpleasant memories she had previously experienced with one of her other children. According to the Bankerts, Dr. Nelson refused their request and did so in a rude, loud and firm manner. It is undisputed that had Dr. Nelson honored Kimberly and Dennis Bankert's request for cesarean section when they asked for it, Kimberly Bankert never would have experienced a uterine rupture, and never would have been required to undergo an emergency cesarean and emergency hysterectomy. The Court concludes that the defendant owed a duty to reasonably accommodate the request of Kimberly Bankert for a cesarean section. The Court further concludes that defendant, by refusing the cesarean section, breached its duty, departed from the standard of care, and, thereby, proximately caused the uterine rupture to Kimberly Bankert.

## C. *Ariel J. Bankert's Negligence Claim*

■ The Court also believes that the defendant acting through its employees violated the applicable standards of care as to Ariel J. Bankert.[11] *First,* the applicable standard of care required a delivery of Ariel as quickly as possible following the onset of bradycardia at 6:32 p.m. Dr. Rupe recognized that the situation entailed an emergency and needed the immediate assistance of Dr. Nelson. *Either* Dr. Rupe issued an order for a stat page which was ignored by staff (Nurse Penny Davis in particular), *or* as the Court found no stat page was ordered. At any rate it is a distinction here without real meaning. Dr. Nelson did not arrive in the room until approximately sixteen minutes after the onset of the fetal bradycardia. Once arriving at bedside, Dr. Nelson quickly set up for a surgical delivery whereupon Ariel was delivered at 6:59 p.m., approximately 27 minutes after the onset of the fetal bradycardia.

The standard of care required delivery of the infant as quickly as possible. Kimberly Bankert as a "VBAC" candidate was a high risk patient. Possible fetal distress was noted earlier, and labor had not progressed as well as expected. The failure to have issued a stat page at the onset of the fetal bradycardia represented a departure from the applicable standard of care. The American College of Obstetrics and Gynecology (ACOG) Guidelines requiring the delivery of a child within thirty (30) minutes from the time the decision is made to surgically intervene until the delivery of the infant is merely a guideline. It represents, in the Court's view, the maximum period of elapse. Those guidelines cannot blindly address every situation of emergency cesarean delivery.

In the circumstances of this case (i.e. high risk (VBAC) patient, earlier note of possible fetal distress, patient having earlier requested a cesarean delivery following twelve (12)

---

11. There is no dispute with regard to causation in this matter. Both parties agree that had Ariel been delivered by cesarean section prior to 6:30 p.m. on January 22, 1992, Ariel likely would have been born without distress and would not have suffered any physical injury. It is further clear that Ariel's injury primarily occurred "intra-partum," which is the period after the rupture of the uterus and prior to her delivery by emergency section.

hours of relatively slow progress at an attempted vaginal delivery, and Dr. Rupe (attending physician) having recognized that she had an emergency within seconds of the onset of the fetal bradycardia and needed immediate assistance) a stat page rather than a regular page to Dr. Nelson was mandatory. There was, in the Court's view, an unreasonable delay of several critical minutes in delivering Ariel Bankert, caused by the failure to have arranged for a stat page. The timing of her delivery, therefore, fell below the applicable standard of care.

The evidence further reflects that after Ariel's delivery, the staff failed to diagnose or treat Ariel's pneumothorax. It was not until the neonatal intensive care unit from Bethesda Naval Hospital arrived at Malcolm Grow Medical Center, that the presence of a right-sided pneumothorax was diagnosed. It was then immediately treated by inserting a chest tube into the infant which then enabled Ariel's lungs to expand so as to assist in her breathing. While it is impossible to determine what percentage of Ariel's injury was caused by the delayed diagnosis and treatment of the pneumothorax, the Court believes that such failure contributed to the injuries sustained, and also constituted a deviation from the applicable standard of care.

### D. *Kimberly Bankert's Informed Consent Claim*

 Maryland subscribes to the doctrine of informed consent. Under this rule, a physician, treating a mentally competent adult under non-emergency circumstances, cannot properly undertake therapy without the prior consent of his patient and cannot provide treatment to the patient except in accordance with the patient's authorization and consent. *Sard v. Hardy,* 281 Md. 432, 438–439, 379 A.2d 1014 (1977). "The fountain head of the doctrine of informed consent is the patient's right to exercise control over his own body, at least when undergoing elective surgery, by deciding for himself whether or not to submit to the particular therapy." *Sard,* 281 Md. at 439, 379 A.2d 1014.

This doctrine, then, "imposes on a physician, before he subjects his patient to medical treatment, the duty to explain the procedure to the patient and to warn him of any material risks or dangers inherent in or collateral to the therapy, so as to enable the patient to make an intelligent and informed choice about whether or not to undergo such treatment." *Id.* "Once the physician has ascertained the risks and alternatives, and has communicated this information to the patient, it is the patient's *exclusive right* to weigh these risks together with his individual subjective fears and hopes and to determine whether or not to place his body in the hands of the surgeon or physician" and whether or not to follow the physician's recommendation or some other treatment alternative. *Id.* at 443, 379 A.2d 1014 (citing *Collins v. Itoh,* 160 Mont. 461, 503 P.2d 36, 40 (1972)). "The law does not allow a physician to substitute his judgment for that of the patient in the matter of consent to treatment." *Sard,* 281 Md. at 440, 379 A.2d 1014.

 Kimberly Bankert claims that defendant first violated her right to informed consent by failing to inform her of the risks of pitocin prior to its use. To sustain a cause of action on her informed consent claim, Mrs. Bankert must establish: (1) that the physician failed to warn her of a material risk inherent in or collateral to the proposed therapy; (2) that the undisclosed risk materialized and caused injury; and (3) that a reasonable person in her position would not have consented had there been a disclosure of the material risk. *See Zeller v. GBMC,* 67 Md.App. 75, 506 A.2d 646 (1986); *Lipscomb v. The Memorial Hospital,* 733 F.2d 332 (4th Cir.1984). *Sard* further held that the causality requirement is an "objective test: whether a reasonable person in the patient's position would have withheld consent to the surgery or therapy had all material risks been disclosed." *Sard,* 281 Md. at 450, 379 A.2d 1014. She must prevail on each element to satisfy this test.

In this case, the Court believes that Mrs. Bankert has sustained her burden. Mrs. Bankert has established by a preponderance of the evidence (1) that the risks of pitocin, including the increased risk of uterine rupture, were not disclosed to her; (2) that the undisclosed risk of uterine rupture materialized and caused injury; and (3) that a rea-

sonable person in her position and under the totality of circumstances she found herself in would likewise have declined the treatment had she been aware of the risks. In fact, it was not long after the administration of pitocin that Mr. and Mrs. Bankert specifically requested a cesarean section and wanted no further attempt at vaginal delivery. It is doubtful, in the Court's view, that a reasonable patient in Kimberly Bankert's position would necessarily have followed Dr. Nelson's advice to proceed with labor; particularly in light of the entire circumstances previously described.

The Court also cannot accept the argument that the administering of pitocin to Mrs. Bankert did not require a separate informed consent on the part of the patient. The defendant posits that the general consent form to vaginal delivery executed by Mrs. Bankert on January 22, 1992, covered the infusion of pitocin during her labor. The Court, however, believes that because the use of pitocin increased the risk of uterine rupture and also created the risk of fetal distress, the appropriate standard of care required a separate discussion of its risks and benefits prior to it administration. Moreover, there was ample and credible testimony that it was policy, practice and procedure at Malcolm Grow Hospital for the attending physician to explain the risks and benefits of pitocin administration if, during the course of labor, a decision was reached to use pitocin, to obtain the patient's informed consent for use of the medication. The failure of Dr. Rupe or other staff personnel to advise Kimberly of the risks of pitocin augmentation constituted a breach of hospital policy, a departure from the applicable standard of care, and a breach of the informed consent doctrine.

In addition, the Court is also convinced that the defendant continued the trial of labor without Kimberly Bankert's consent and contrary to her [and her husband's] request around 3:00–3:45 p.m. for a cesarean section. As stated previously, "the law does not allow a physician to substitute his judgment for that of the patient in the matter of consent to treatment." *Sard*, 281 Md. at 440, 379 A.2d 1014. Moreover, "a corollary to the [informed consent] doctrine is the patient's right, in general, to refuse treatment and to withdraw consent to treatment once begun." *Mack v. Mack*, 329 Md. 188, 210, 618 A.2d 744 (1993). It is undisputed that Kimberly and Dennis Bankert first requested cesarean section delivery from Penny Davis, the Labor and Delivery Nurse, then from Dr. Mary Beth Kerr Jackson, her attending Family Practice Physician, and ultimately the request for cesarean section was communicated directly to Dr. James Nelson, the attending obstetrician.

The defendant (Dr. Nelson in particular) asserts that there was no medical indication for a cesarean section at that time, that the Bankerts' request was based on misinformation, and that to have performed cesarean delivery on the misinformed request would have constituted fraud, malfeasance, and would have been unethical. Nevertheless, Dr. Nelson contends he would have performed the section had the Bankerts insisted rather than merely requested, the cesarean section. Finally, Dr. Nelson testified that from the Bankerts' subsequent silence, he assumed they had acquiesced in his decision that labor should proceed.

The Court disagrees. *First*, regardless of whether there was or was not misinformation, the Court finds that the request by the Bankerts was not based solely on the medical indications at that time; on the contrary, the Court finds that the request was undergirded by several factors and apprehensions clearly reasonable under the totality of the circumstances confronting them. Mrs. Bankert had been laboring for more than 12 hours with rather slow progress. The Bankerts wanted to avoid a repeat of their previous unpleasant experience with an emergency cesarean, and they began to feel that Kimberly Bankert would not succeed in vaginal delivery. Of course, they were also concerned about their baby. They observed the interventions (change in position, infusion of fluids, and use of oxygen) which had been employed by staff, and they heard comments and discussions by staff as to the slow progress of labor. For all of these reasons, they had reservations as to whether they should continue with labor.

*Secondly,* the situation in the bedroom was very tense and emotional. Dr. Nelson did not recall how many times Mr. Bankert requested a cesarean delivery, but he did testify that Dennis Bankert became a little belligerent, perhaps, upset and angry at the decision of Dr. Nelson not to perform the cesarean section. At some point, the conversation abruptly ended, and the Bankerts became silent. Dr. Nelson says that they "backed off." He believed and argues, therefore, that Mrs. Bankert never withdrew her consent to the trial of labor.

The Court disagrees. Backing off under these circumstances is hardly acquiescence. Dr. Nelson, in effect, blocked the direction in which they wanted to go. Immediately after Dr. Nelson left the room, Kimberly Bankert called her girlfriend, to complain that she was angry that Dr. Nelson had been rude, had hollered at them, and had refused their request for cesarean delivery. Shortly thereafter, both Mr. and Mrs. Bankert complained to Dr. Rupe. She indicated that it was out of her hands. Moreover, following the delivery and while recovering from the cesarean section and the hysterectomy, Kimberly Bankert advised Dr. Rupe that she did not want to talk with Dr. Nelson who would be entering the room to discuss what had occurred. These discussions and comments by the Bankerts following the encounter with Dr. Nelson at 3:30–3:45 p.m. were most significant and further convince the Court that Dr. Nelson refused their request for a cesarean delivery. Nor can the Court conclude that Dr. Nelson had a reasonable basis to believe that the Bankerts had not withdrawn their consent for vaginal delivery. It also appears quite reasonable for Dennis Bankert to have exhibited some deference to Dr. Nelson, an officer and his superior in rank, which possibly explained why "they backed off." Furthermore, Dr. Nelson conceded that Dennis Bankert was "somewhat belligerent." The record is simply devoid of any reasonable basis to conclude that the Bankerts had acquiesced in Dr. Nelson's decision to continue labor. Mere silence, under these circumstances, did not amount to acceptance of the decision reached by Dr. Nelson.

In summary, the Bankerts made a personal decision as patients to withdraw their consent to the trial of labor and to request the alternative, medically acceptable, approach of cesarean delivery. Although Dr. Nelson exercised his medical judgment and determined that cesarean delivery was not medically indicated, he nevertheless denied Kimberly Bankert the right to withdraw her consent to a particular medical procedure, and he denied her the opportunity to exercise her personal autonomy to make decisions regarding her own body. The Court concludes that defendant violated Mrs. Bankert's right to informed consent.

E. *Damages*

■ Having determined that the United States is liable in this action for the tortious actions of its employees and agents, the Court next considers what damages are to be awarded. Maryland limits non-economic damages to $350,000 and requires the trier of fact to itemize economic damages. Md.Code Ann.Cts. and Jud.Proc. §§ 11–108 and 11–109. Both Ariel and Kimberly Bankert claim noneconomic damages as a result of the acts of the defendant in this case. A claim for economic damages in the amount of $2,289,-979 has also been asserted on behalf of Ariel for future medical expenses, future loss of income, and other future educational and related expenses.

■ With reference to the noneconomic damage claim of Ariel, it is undisputed that she has been diagnosed as suffering from a form of cerebral palsy, accompanied by right sided hemiparesis. She also has difficulties with fine motor skills, language skills and has some problems with adaptive as well as cognitive skills. These difficulties along with the related injuries sustained through the combination of birth complications and neonatal circumstances were proximately caused by a breach of standard of care owed by the defendant, and are clearly recoverable as compensable non-economic damages. The Court believes that an award of $350,000.00 in non-economic damages to Ariel Bankert is appropriate.

■ Kimberly Bankert has also sustained damages because of the tortious conduct of

the defendant. She experienced the trauma of the rupture of her uterus and the resulting hysterectomy and loss of blood. In connection with the hysterectomy, the left ovary and fallopian tube was removed with a concomitant loss of her reproductive capacity. The defendant argues that no award should be made for loss of reproductive capacity inasmuch as there was testimony from witnesses who heard Kimberly Bankert state that she did not plan to have additional children after Ariel. The simple response to this argument is that Kimberly Bankert did not request a hysterectomy. Moreover, as a 31 year old female, she was more than able to have other children and could have changed her mind about having more children. She is now unable to change her mind, and has permanently lost child bearing years that she otherwise would possess. The Court, therefore, believes that an award of $200,000 in non-economic damages appropriately compensates Kimberly Bankert for her damages.

■ Lastly, the Court addresses the claim on behalf of Ariel Bankert for economic damages. This issue is far more complex and difficult inasmuch as Ariel is only four years old, and is not yet at school age. Further complicating the issue is the fact that Ariel has made significant improvements in her functional capabilities because of various early intervention services, yet she still requires further therapy, evaluations, monitoring and other services in order to accommodate her needs.

■ The essential dilemma before the Court is [to put it succinctly and in the words of Kimberly Bankert] that we "don't know what's going to happen to Ariel." The evidence in support of economic damages produced by Plaintiff at best indicated that Ariel is "at risk" for the development of a learning disability and/or problems with executive functioning. In *Davidson v. Miller*, 276 Md. 54, 62, 344 A.2d 422, 427-28 (1975), the Court of Appeals of Maryland, while addressing the burden of proof in medical malpractice cases, stated: "In Maryland, recovery of damages based on future consequences of an injury may be had only if such consequences are reasonably probable or reasonably certain. Such damages cannot be recovered if further

consequences are 'mere possibilities.' Probability exists when there is more evidence in favor of a proposition than against it (a greater than 50% chance that a future consequence will occur). Mere possibility exists when the evidence is anything less." *See also Muenstermann v. United States*, 787 F.Supp. 499, 522 (D.Md.1992); *Weimer v. Hetrick*, 309 Md. 536, 549–550, 525 A.2d 643, 650 (1987).

To award economic damages for future consequences to Ariel in this case requires proof that such projected damages will likely, reasonably and probably result from the acts of the defendant. With the possible exception as to the need for continuous and supplemental therapeutic services, the Court cannot find that plaintiffs have established to a reasonable degree of probability entitlement to the individualized life care plan for Ariel Bankert outlined by Dr. Sheryl Ranson. Dr. Ranson's conclusions (that it is unlikely that Ariel will be gainfully employed in the competitive labor market, will likely be in some kind of sheltered program or in a supported employment program, and will likely require respite long term care and supported living assistance) are no more than conjecture and sheer speculation. The assumptions and conclusions taken by Dr. Ranson are based upon a negative or "worst scenario." As Kimberly Bankert testified we "don't know what is going to happen to Ariel." The Court likewise is not in a position to predict. Fortunately, the evidence reflects continued improvement and some positive response through early interventional services.

Moreover, although plaintiffs have decided to home school Ariel, along with their other children, they are still entitled to supplementary intervention and treatment services with the public school system or at a placement approved by the school system. Presently, Ariel is enrolled in the Paul Hahn Clinic with the Prince George's County Community College. While Ariel is not receiving public school treatment services during the summer, it is possible that she may return for limited special educational services with the Prince George's County Public School Sys-

tem.[12] Inasmuch as the Bankerts intend to home teach Ariel, and in light of the supplemental services through public education, as well as the various benefits available to Ariel as a dependent of Dennis J. Bankert, the Court cannot find a general basis to award economic damages for those services.

The Court does believe, however, and does find from a review of the medical records that to assure maximum development Ariel should receive therapy at least once or twice per week for a reasonable period of time. This therapy more likely than not, is in addition to what is publicly available, will have to be worked in around Ariel's "home schooling," and, more probably, will include services (including yearly evaluations) not covered by benefits possessed by Dennis Bankert.

The Court believes and finds that these additional therapeutic services are reasonably necessary at least once per week at a cost of $200 per week for the next five years.[13] A yearly evaluation and report at $200 per year is also reasonably necessary. Accordingly, the Court awards $43,000.00 in economic damages to Ariel for future supplemental therapeutic services over the next five years.

Finally, the Court simply cannot find, by a preponderance of the evidence, a causal connection between Ariel's alleged injuries and behavior difficulties. Neither can the Court conclude that plaintiff has proven by a reasonable probability that Ariel is entitled to any other future economic awards set forth under Dr. Ranson's life care plan. As stated before, Ariel may be "at risk," however, "at risk" is the very essence of "mere possibilities," which cannot be the basis of an award for economic damages.

### SUMMARY

In light of the foregoing Findings and Conclusions, the Court concludes that the defendant, United States of America, in acting by and through its agents negligently, tortiously and proximately caused damage to Kimberly and Ariel Bankert. The Court finds that plaintiffs are entitled to the damages set forth herein. The total damage award is $593,000.00 which includes $350,000.00 to Ariel Bankert representing non-economic damages, $43,000.00 to Ariel Bankert representing future economic damages, and $200,000.00 to Kimberly Bankert representing non-economic damages.

### JUDGMENT

Based upon the Findings of Fact and Conclusions of Law heretofore set forth, judgment is entered for Ariel Bankert against the United States of America in the sum of $393,000.00, and judgment is further entered on behalf of Kimberly Bankert against the United States of America in the sum of $200,000.00.

---

12. The Bankerts have not pursued a plan of treatment with the county school for this fall as the family is attempting to get an early 15 year retirement from the service.

13. Considering time off for summer and excluding vacations and holidays, the Court believes that Ariel is likely to be available for supplemental therapy 42 weeks during each of the next 5 years.