771 A.2d 446

**LEWIN REALTY III, INC.,**

v.

**Sean BROOKS, Jr., A Minor, etc. et al.**

**No. 254, Sept. Term, 2000.**

Court of Special Appeals of Maryland.

April 26, 2001.

248

250

252

Frank F. Daily (Cynthia D. Spirt, on the brief), Hunt Valley, for appellant.

Harvey S. Wasserman (Saul E. Kerpelman & Associates, P.A., on the brief), Baltimore, for appellees.

Argued before HOLLANDER, DEBORAH S. EYLER, and LEONARD L. RUBEN (Ret'd, Specially Assigned), JJ.

DEBORAH S. EYLER, Judge.

In this lead paint premises liability case, a jury in the Circuit Court for Baltimore City returned a verdict in favor of Sean Brooks, Jr., a minor, by his mother Sharon Parker, appellees, and against Lewin Realty III, Inc. ("Lewin"), appellant. It awarded damages totaling $750,000. Lewin noted an appeal from the judgment, and presents the following first question for review, which we have rephrased:

 I. Did the trial court err in admitting into evidence lead paint violation notices pertaining to other properties?

We answer "yes" to this question. Because we conclude that the error was prejudicial, we shall reverse the judgment and remand the case to the circuit court for further proceedings. We will address two other questions raised by Lewin for the guidance of the court on remand. They are:

II. Did the trial court err in allowing the appellees' vocational rehabilitation witness to testify as an expert?

III. Did the trial court err in denying appellant's motion for summary judgment on the issue of "reason to know" of the presence of deteriorated lead paint on the premises? [1]

## FACTS AND PROCEEDINGS

In August 1988, Shirley Parker rented a house at 1202 North Patterson Park Avenue, in Baltimore City. Fresh paint was applied to the interior of the house at the beginning of the tenancy.

Sharon Parker, Shirley Parker's daughter, moved into the North Patterson Park Avenue house ("the House") soon after her mother rented it.[2] On December 6, 1989, Sharon gave birth to Sean, the minor appellee, who lived there too.

Sometime in February or March 1991, when Sean was slightly more than a year old, Lewin purchased the House at auction. Lewin is owned by four stockholders, one of whom is

---

1. The remaining questions presented by Lewin are:

IV. Did the trial court err in giving a jury instruction on failure to warn?

V. Did the trial court err in denying appellant's motion for new trial or for remittur?

VI. Did the trial court err in denying appellant's motion for change of venue?

Issue IV may not arise on a trial on remand because the appellees may amend their pleadings in the interim. Issue V is specific to the amount of the verdict returned in this trial. Finally, Issue VI focused on pre-trial publicity that occurred immediately before the case was tried.

2. Because Shirley Parker and Sharon Parker have the same last name, we will refer to them by their first names.

Marvin Sober. The company has no employees. Mr. Sober is in charge of managing the company and conducting its day to day business. Before Lewin purchased the House, Mr. Sober went on a "walk through" inspection of it. Sharon was present when the "walk through" took place, and accompanied Mr. Sober as he inspected the House. Sharon testified that at the time of the "walk through," there was peeling, chipping, and flaking paint present in numerous areas of the interior of the House, including in Sean's bedroom.

After Lewin purchased the House, it entered into a new lease with Shirley. It did not re-paint the interior of the House at that time.

In February 1992, Sean was diagnosed with an elevated blood lead level. Four months later, in May 1992, a nurse from the Baltimore City Health Department ("BCHD") came to the House and spoke to Sharon about Sean's elevated blood lead level. Sharon testified that she first learned about Sean's condition at that time. That same month, the BCHD issued a lead paint violation notice for the property to Lewin. The House was inspected and found to contain 56 areas of peeling, chipping, and flaking lead paint.

Marvin Sober testified about his background and experience in the residential property leasing business. He stated that he started in that line of work in Baltimore City, in 1976. By the time relevant to this case, he was working for Lewin, and owned approximately 100 properties in the neighborhood of the House. Mr. Sober explained that he was the person to whom complaints concerning Lewin's properties were to be made, and who addressed them.

Mr. Sober testified that, as long ago as 1982, he was aware of the health dangers associated with lead paint exposure. By 1983 or 1984, he knew that lead paint exposure was dangerous to young children. In addition, before 1991, he knew that peeling, chipping, or flaking paint, whether on walls or woodwork, is the primary source of lead poisoning for young children and that the Baltimore City Code prohibits maintaining a residential property in such condition. Mr. Sober stated

that the House was at least 50 years old. He admitted that at the time relevant to this case, he knew that in Baltimore City older houses generally were more likely than newer houses to contain lead paint.

Mr. Sober acknowledged conducting the "walk through" of the House for Lewin, before Lewin purchased it at auction. He was not asked on direct or cross-examination whether he saw peeling, chipping, or flaking paint during the "walk through." Mr. Sober further testified that after Lewin purchased the House, he was inside it on various occasions, from March 1991 to May 1992. Again, he did not address in his testimony, either on direct or cross-examination, what he did or did not see on those visits. Mr. Sober did say, however, that during that period, and until he received the lead paint violation notice, Shirley Parker did not make any complaints to him about the condition of the paint in the House.

A housing inspector for Baltimore City was called as a witness by the appellees. He stated on direct examination that upon inspection, the House was found to have numerous areas of peeling, chipping, and flaking lead paint. On cross-examination, the witness explained that lead paint inspections are done with devices that detect the presence of lead in intact paint. For that reason, a lead paint notice that says that lead paint has been found to exist in a property does not necessarily mean that the paint inside the property is peeling, chipping, or flaking. The inspection could have detected intact lead paint.

Additional facts will be included in our discussion of the issues.

## DISCUSSION

### I

Before trial, Lewin moved *in limine* to keep out of evidence five documents entitled, "Emergency Violation Notice and Order to Remove Lead Nuisance." These violation notices, which were issued at various dates in the 1980's, pertain to

properties other than the one at issue in this case.[3] The violation notices were issued by the Baltimore City Health Department to Mr. Sober and to the companies with which he then was associated. Each violation notice states:

It has been determined from elevated blood lead[4] and an investigation by the Baltimore City Health Department that a child who frequents the above dwelling has an abnormal blood lead level. An inspection of this dwelling shows it contains lead-based paint. Such condition has been deemed by the Commissioner of Health to be hazardous to life and health and a public health nuisance.

In its motion *in limine,* Lewin argued that the violation notices were not relevant, were inadmissible "other bad acts" evidence, and were prejudicial. In argument before the trial court, Lewin acknowledged that the violation notices would be specially relevant to the issue of its knowledge (through Mr. Sober) of the health hazards of lead paint, if that issue were contested. Lewin proffered that Mr. Sober would testify that, at the relevant time, he in fact had such knowledge. It argued that because the issue of knowledge of the danger of lead paint was not contested, and the violation notices were not otherwise specially relevant, the court was required to exclude them. Counsel for the appellees replied that Mr. Sober had not conceded knowledge of the danger of lead paint in his deposition testimony.

The court denied the motion, but indicated that Lewin could renew its objection to the violation notices during trial. The court advised counsel for the appellees not to mention the notices in his opening statement.

As we have explained, when Mr. Sober testified, he admitted that several years before he conducted the "walk through"

---

**3.** Two of the lead paint notices date from 1988; the remainder date from 1984, 1987, and 1989. The properties to which they pertain are: 318 North Schroeder Street; 616 East Biddle Street; 2569 West Baltimore Street; 925 Argyle Avenue; and 1429 Madison Avenue.

**4.** Two of the notices use the phrase "blood lead results" in place of "elevated blood lead."

of the House, he had actual knowledge of the health hazards to children of lead paint. Mr. Sober was not asked any questions about the five violation notices for the other properties. Indeed, those notices were not mentioned during the testimony of any witness at trial.

At the close of the appellees' case, their counsel offered the five violation notices into evidence. Lewin objected and argued that the evidence was not relevant and, if relevant, was highly prejudicial. The appellees' counsel conceded that the issue of Lewin's knowledge (through Mr. Sober) of the hazards of lead paint at the pertinent time was not in dispute. He argued, however, that the notices were relevant to the issue of whether Lewin knew or had reason to know of the presence of deteriorating paint in the House when the minor appellee was living there. The court allowed the notices to come into evidence.

In closing argument, counsel for the appellees said to the jury, referring to Mr. Sober:

What does the evidence show? And not only did he have that academic or educational understanding of what lead could do and what was required, he had firsthand knowledge and firsthand experience of having children in his homes before this one exposed to and poisoned by lead. All of that knowledge he had, all of that experience he had is what you need to consider and evaluate in determining what conduct was required of Mr. Sober under the circumstances of this case.

In this Court, Lewin contends that the trial court erred in admitting the five violation notices into evidence. It argues that the admissibility of the notices was governed by Md. Rule 5-404(b); that the trial court failed to analyze the violations under that rule; that the notices were not specially relevant to a contested issue in the case, and instead were offered and used as propensity evidence; and that, even if the admissibility of the notices properly was controlled by Md. Rule 5-403, not Md. Rule 5-404(b), the trial court nevertheless abused its

discretion in concluding that the probative value of the notices outweighed their prejudicial effect.

The appellees respond that the trial court did not abuse its discretion in admitting the violation notices into evidence because they were relevant to the contested issue of notice and they were not highly prejudicial. The appellees maintain that Lewin waived its Md. Rule 5–404(b) argument, and that, even if the argument was not waived, it lacks merit because that rule does not apply to civil cases. They argue further that, even under a Md. Rule 5–404(b) analysis, the notices were specially relevant to the contested issue of whether Lewin (through Mr. Sober) knew or had reason to know of the existence of deteriorated paint in the House during the relevant time frame. They assert that evidence, as shown in the notices, that other residential properties owned or managed by Mr. Sober (or one of his companies) contained lead-based paint, and that children who frequented those properties were diagnosed with elevated blood levels, was probative of the contested issue of notice. Finally, they argue that the evidence was not prejudicial in any event.

■ Md. Rule 5–404(b) states:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, common scheme or plan, knowledge, identity, or absence of mistake or accident.

The rule presumptively excludes evidence of other crimes, wrongs, or acts, unless the evidence is specially relevant. *See Conyers v. State,* 345 Md. 525, 550, 693 A.2d 781 (1997); *Harris v. State,* 324 Md. 490, 494–97, 597 A.2d 956 (1991).

■ As an initial matter, the appellees take the position that Lewin waived its Md. Rule 5–404(b) argument for appeal because it failed to raise the rule as a basis for its objection to the admission of the evidence at trial. Under Md. Rule 2–517, an objection to the admission of evidence must be made at the time the evidence is offered, or the objection is waived. A

motion *in limine* to exclude evidence ordinarily will not preserve the issue for review if no objection is made to the introduction of the evidence at trial. *See Cole v. Sullivan,* 110 Md.App. 79, 87–88, 676 A.2d 85 (1996).

At the pre-trial hearing on its motion *in limine,* Lewin argued that the violation notices were "analogous to prior bad act issues and prior criminal violations" and were not relevant. At the conclusion of the hearing, the court denied the motion, but stated, "[t]his is not the end of the matter,.... Having denied your motion *in limine* as to violation notices, I will deal with it as necessary during the course of the trial on evidentiary grounds, if necessary."

At trial, Lewin objected to the introduction of the notices. It argued that the notices were prejudicial and were not relevant. Lewin stated that the violation notices had "nothing to do with this property and this family. What they want to put in front of the jury are allegations about other properties that have nothing to do with this situation."

The appellees assert that, in objecting during trial, Lewin argued only that the violation notices were inadmissible under Md. Rule 5–403, not under Md. Rule 5–404(b). Yet, nothing in the record specifies that the objection was based on Md. Rule 5–403 as opposed to Md. Rule 5–404(b): Lewin did not explicitly identify any of the Maryland Rules in stating its objection, and the court did not ask it to do so. The content of the argument advanced by Lewin makes it clear, however, that it was objecting to the use of the notices to prove propensity. Additionally, the court stated at the hearing on the motion *in limine* that it would reconsider Lewin's motion at trial, if the issue arose. Based on this statement by the trial court and the substance of the argument made by Lewin when it objected at trial, it is clear that Lewin was renewing the objection made in its motion *in limine* by raising the same objection at trial. Thus, Lewin did not abandon its position that the violation notices were prior bad acts evidence, governed by Md. Rule 5–404(b). *See* Md. Rule 2–517. As the Md. Rule 5–

404(b) basis for the objection was before the trial court, the issue was not waived.

As stated above, Md. Rule 5–404(b) applies to exclude evidence of other wrongs committed by a defendant. Lewin maintains that the rule applies to the instant case because the prior violation notices constituted evidence of "other bad acts." Evidence of other wrongs or acts is frequently referred to as "bad act" evidence. *Klauenberg v. State,* 355 Md. 528, 547, 735 A.2d 1061 (1999). "Bad act" evidence is evidence of conduct that, though not necessarily criminal, "tends to impugn or reflect adversely upon one's character, taking into consideration the facts of the underlying lawsuit." *Id.* at 549, 735 A.2d 1061.

In the case *sub judice,* the evidence at issue consisted of five lead paint violation notices from the BCHD, for five separate residences managed by Mr. Sober, each reporting an abnormally high blood lead level in a child who frequented the property, and that an inspection of the property revealed the presence of lead paint. The case at bar also involved a child with an abnormally high blood lead level and lead paint at a property connected to Mr. Sober. In this context, it is self-evident that the notices would tend to portray Mr. Sober, and hence Lewin, as an irresponsible landlord who leased defective and unsafe properties. Accordingly, the violation notices constituted evidence of "other bad acts."

With respect to the appellees' assertion that Md. Rule 5–404(b) was not applicable because that rule only applies in criminal cases, we note that the plain language of the rule contains no such proviso. It states only that evidence of other acts "is not admissible to prove the character of a person in order to show action in conformity therewith." Moreover, subsection (a) of the rule, entitled "Character evidence generally," also does not differentiate between criminal and civil cases. It states: "In general. Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion...." Only in two of the exceptions to that rule, for

"character of the accused" and "character of the victim," which are defined to pertain only to criminal and juvenile cases, is a distinction drawn between criminal and civil cases. *See* Md. Rule 5–404(a)(2).

We note also that in a line of automobile tort cases decided in the mid and early 1900's, the Court of Appeals held that evidence of a party's history of safe driving or of a party's history of unsafe driving was not admissible to prove action in conformity therewith. *See Houlihan v. McCall,* 197 Md. 130, 137–38, 78 A.2d 661 (1951); *Nesbit v. Cumberland Contracting Co.,* 196 Md. 36, 44, 75 A.2d 339 (1950); *General Exchange Ins. Corp. v. Sherby,* 165 Md. 1, 165 A. 809 (1933); *B & O Railroad Co. v. State ex rel. Black,* 107 Md. 642, 69 A. 439 (1908).

The appellees nevertheless argue that all of the Maryland cases addressing Md. Rule 5–404(b) and, before its adoption, the analysis applicable to admission of other bad act evidence, are criminal cases.[5] They also maintain that the holding of the Court of Appeals in *Sessoms v. State,* 357 Md. 274, 744 A.2d 9 (2000), supports their position that Md. Rule 5–404(b) applies only in criminal proceedings.

*Sessoms* involved the exclusion of evidence of prior crimes committed by a fact witness. The Court held that Md. Rule 5–404(b) "does not apply to crimes, wrongs, or acts committed by anyone other than *the defendant.* ... [I]t does not apply to exclude acts committed by other people...." *Id.* at 281, 744 A.2d 9 (emphasis added). The Court reasoned that the purpose of this rule of exclusion is three-fold: to prevent "(1) the

---

**5.** This assertion is not quite correct. In *Coburn v. Coburn,* 342 Md. 244, 674 A.2d 951 (1996), the Court addressed Md. Rule 5–404(b) in the context of a civil protective order hearing between a husband and wife. The husband was arguing that evidence of his prior acts of abuse against his wife was inadmissible under Md. Rule 5–404(b). The Court stated that the rule was not applicable because the evidence in question was being introduced "not to prove that a respondent has acted in conformity with those prior acts, but instead to prove the likelihood of future abuse." *Id.* at 260, 674 A.2d 951. The Court never suggested that Md. Rule 5–404(b) would be inapplicable in a non-criminal context, however.

strong tendency to find the accused guilty of the charge merely because of his or her history of committing such acts; (2) the tendency to condemn the accused not because of guilt, but because he or she escaped punishment from previous offenses; and (3) the injustice of unfair surprise." *Id.* at 283, 744 A.2d 9 (citing 1A John Henry Wigmore, *Evidence* § 58.2, at 1215 (Tillers rev.1983)). *See also Harris v. State,* 324 Md. at 495–96, 597 A.2d 956. The Court stated that Md. Rule 5–404(b) was designed to "ensure that a defendant is tried for the crime for which he or she is on trial and to prevent a conviction based on reputation or propensity to commit crimes, rather than the facts of the present case." *Sessoms,* 357 Md. at 281, 744 A.2d 9. *See also Harris,* 324 Md. at 496, 597 A.2d 956. It also observed that "this rule is premised upon protecting an accused from undue prejudice...." *Sessoms,* 357 Md. at 281, 744 A.2d 9. The Court concluded that extending Md. Rule 5–404(b) to individuals other than defendants would "broaden[ ] it beyond the type of prejudice that this rule was designed to prevent." *Id.* at 285, 744 A.2d 9.

In reaching its decision in *Sessoms,* the Court explained that "Maryland Rule 5–404(b) served to codify the other crimes evidence rule expressed in Maryland caselaw and was derived from Federal Rule of Evidence (FRE) 404(b)." *Id.* After examining how the federal courts have analyzed FRE 404(b), the Court concluded that its interpretation of the rule, as applying only to defendants, and not to witnesses, comports with federal case law. *Id.* at 287–90, 744 A.2d 9.

Although the Court in *Sessoms* did not address the question before us, whether Md. Rule 5–404(b) applies to a defendant in a civil case, the appellees argue that the language of the Court, focused as it is on the purpose of the rule being to ensure that a defendant is tried for the "crime" for which he is on trial and to protect "the accused" from undue prejudice, makes plain that the rule was intended to apply only in the criminal context. We disagree. Notwithstanding the Court's choice of language in *Sessoms,* the Court's stated objective of the rule, to protect the defendant from the undue prejudice likely to result from introduction of propensity evidence, is

implicated in criminal *and* civil cases. *See also Streater v. State*, 352 Md. 800, 807, 724 A.2d 111 (1999) (commenting that the "substantive and procedural protections [of Md. Rule 5–404(b) ] are necessary to guard against the potential misuse of other crimes or bad acts evidence and avoid the risk that the evidence will be used improperly by the jury against a defendant."). In both contexts, whether the defendant committed the crime or wrong for which he is on trial is meant to be decided on the basis of direct and circumstantial evidence of the acts or omissions in question, and not on the basis that, having committed a crime or wrong in the past, he likely did so again. Although the stakes may be higher in a criminal case, where the defendant may lose his freedom or his life, in addition to his property, the defendant in a civil case is equally entitled to a fair proceeding, free of the prejudice likely to result from introduction of propensity evidence.[6]

In *Medical Mutual v. Evans*, 330 Md. 1, 622 A.2d 103 (1993), decided before the Maryland Rules of Evidence were adopted, the Court implicitly recognized that the principle now embodied in Md. Rule 5–404(b) applies in civil cases. In a medical malpractice case against her doctor, a jury had awarded Evans damages well in excess of the defendant/doctor's policy limits. The doctor assigned his "bad faith failure to settle" claim against his carrier to Evans, who then sued the carrier. At trial, Evans's lawyer sought to impeach the carrier's claims manager, on cross-examination, by showing that the claims manager held a personal bias against him, based on the outcome of prior cases in which they had been adversaries, and had not settled Evans's malpractice claim within policy limits out of spite. Evans's lawyer asked the claims manager a question that informed the jury about an earlier malpractice case in which he (counsel) had represented the plaintiff, the carrier had insured the doctor/defendant, the jury had rendered a verdict in excess of policy limits, and the

---

**6.** Likewise, the same interest is implicated for plaintiffs in civil cases, in some circumstances. For example, propensity evidence should not be the basis for a finding of contributory negligence.

carrier eventually had paid the excess amount. The carrier objected and moved for a mistrial. The trial court denied the motion and gave a curative instruction. The case went to the jury, which returned a verdict in favor of Evans.

The Court of Appeals reversed and remanded, holding that the trial court had abused its discretion in denying the motion for mistrial. The Court commented that the question posed to the claims manager "was clearly improper by referring to inadmissible prior 'bad acts.' " 330 Md. at 20, 622 A.2d 103. Emphasizing that there was no factual basis for the assertion that "bad faith" had been adjudicated in the prior case and that "mere accusations of ... misconduct may not be used to impeach," *id.* at 20–21, 622 A.2d 103, the Court concluded that the prejudice resulting from the improper use of prior bad act evidence to cross-examine the claims manager had "transcended the curative instruction." 330 Md. at 24, 622 A.2d 103.

The federal cases interpreting FRE 404(b) also support its application in civil cases. In *Huddleston v. United States,* 485 U.S. 681, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988), the Supreme Court commented, "Federal Rule of Evidence 404(b)—which applies in both civil and criminal cases—generally prohibits the introduction of evidence of extrinsic acts that might adversely reflect on the actor's character,...." *Id.* at 685, 108 S.Ct. 1496. The federal courts accordingly have applied FRE 404(b) in civil, as well as criminal, settings. *See, e.g., Harris v. Davis,* 874 F.2d 461 (7th Cir.1989) (applying FRE 404(b) in a prisoner's 42 U.S.C. § 1983 action); *Semiconductor Energy Lab. Co. v. Samsung Elecs. Co.,* 4 F.Supp.2d 477 (E.D.Va. 1998) (applying FRE 404(b) in a patent case), *aff'd,* 204 F.3d 1368 (Fed.Cir.2000), *cert. denied,* —— U.S. ——, 121 S.Ct. 1187, 149 L.Ed.2d 104 (2001).

We hold that, in conformity with its plain language, its purpose, and the federal case law interpreting FRE 404(b), Md. Rule 5–404(b) applies to defendants in civil cases as well as criminal cases.

The appellees suggest that notwithstanding the foregoing, Md. Rule 5–404(b) did not govern the admissibility of the

violation notices in this case, under the Court's holding in *Sessoms, supra,* 357 Md. 274, 744 A.2d 9, because the notices concerned other bad acts of a witness, Mr. Sober, not other bad acts of the defendant, Lewin. We disagree. The case at bar is factually and legally distinguishable from *Sessoms.*

In *Sessoms,* the evidence of other crimes committed by a fact witness was offered by the defendant to support his theory that the victim had fabricated her accusations against him. The witness alleged to have committed the other crimes was the victim's brother. The defendant sought to show that the victim falsely accused him in an effort to cover up her brother's criminal conduct.

In the case *sub judice,* Marvin Sober was not an ordinary fact witness. He was Lewin's agent in charge of maintaining the company's properties, including the one in question. His general knowledge of the dangers of lead paint, to which he admitted, was imputed to Lewin, as was his knowledge or reason to know of deteriorating paint on the premises. In short, the appellees' negligence claim against Lewin rested on the alleged acts and omissions of Mr. Sober as its agent. For that reason, and not surprisingly, Lewin and Mr. Sober were referred to interchangeably, and without distinction, throughout the trial, including in the appellees' closing argument. For purposes of establishing liability, Lewin and Mr. Sober were, as principal and agent, a single unit. *Cf. Southern Management Corporation v. Taha,* 137 Md.App. 697, 769 A.2d 962 (2001), and *Anne Arundel Med. Ctr. v. Condon,* 102 Md.App. 408, 649 A.2d 1189 (1994) (under common law, when liability is vicarious only, release of agent releases principal); *Chilcote v. Von Der Ahe Van Lines,* 300 Md. 106, 114, 476 A.2d 204 (principal and agent are one tortfeasor for purposes of Uniform Contribution Among Tortfeasors Act). For all intents and purposes, this was a vicarious liability case, with the principal being the sole named defendant. Accordingly, other bad acts of Mr. Sober, the agent/witness, constituted other bad acts of Lewin, the principal/defendant, for purposes of Md. Rule 5–404(b).

When evidence of a defendant's other crimes, wrongs, or acts is offered, the trial court must engage in a three-part analysis in deciding admissibility. *State v. Faulkner,* 314 Md. 630, 634–35, 552 A.2d 896 (1989).[7] First, it must determine whether the evidence is "specially relevant," and, therefore, is excepted from the presumptive rule of exclusion. *Id.* The special relevancy exceptions enumerated in Md. Rule 5–404(b) (proof of motive, opportunity, intent, preparation, common scheme or plan, knowledge, identity, or absence of mistake or accident) are non-exhaustive and not exclusive. *Burral v. State,* 118 Md.App. 288, 297, 702 A.2d 781 (1997), *aff'd,* 352 Md. 707, 724 A.2d 65 (1999). This is a legal determination that does not involve the exercise of discretion. *Solomon v. State,* 101 Md.App. 331, 338, 646 A.2d 1064 (1994), *cert. denied,* 337 Md. 90, 651 A.2d 855 (1995). Next, it must determine whether the defendant's involvement in the other crimes, wrongs, or acts has been established by clear and convincing evidence. *Conyers,* 345 Md. at 550–51, 693 A.2d 781. Finally, the court must weigh the "necessity for and probative value of the 'other crimes' evidence . . . against any undue prejudice likely to result from its admission," and, with that in mind, exercise its discretion to admit or exclude the evidence. *Faulkner,* 314 Md. at 635, 552 A.2d 896. *See also Sessoms,* 357 Md. at 281 n. 2, 744 A.2d 9; *Streater,* 352 Md. at 807, 724 A.2d 111; *Conyers,* 345 Md. at 550–51, 693 A.2d 781.

Because the "special relevancy" *vel non* of the violation notices in question in this case is a pure question of law, we consider it *de novo. Faulkner,* 314 Md. at 634, 552 A.2d 896. *See also Wynn v. State,* 351 Md. 307, 318, 718 A.2d 588

---

**7.** Although the decision in *Faulkner* was prior to the adoption of the Maryland Rules of Evidence, the three-part test laid out in that case remains the law. The Rules of Evidence were intended to codify the Maryland case law of evidence except when inconsistent with that case law. Accordingly, the cases addressing the admissibility of evidence of other crimes, wrongs, or acts are good law; for that reason, the cases decided subsequent to the enactment of the Maryland Rules of Evidence continue to apply the *Faulkner* analysis. *See Sessoms,* 357 Md. at 285, 744 A.2d 9 (stating that Md. Rule 5–404(b) is based on the common law rule).

(1998). Predictably, the parties take diametrically opposed positions on this issue. Lewin asserts that the violation notices only were relevant to a single, non-controverted issue: whether it had knowledge, through Mr. Sober, of the general dangers of lead paint. The appellees argue in their brief that the violation notices were relevant to that issue and to whether Lewin had reason to know, through Mr. Sober, of the presence of deteriorated paint in the House.

To satisfy the first prong of the *Faulkner* test, evidence of other crimes, wrongs, or acts must be "substantially relevant to some *contested issue* in the case." 314 Md. at 634, 552 A.2d 896 (emphasis added). *See also Streater, supra,* 352 Md. at 809, 724 A.2d 111 ("[S]ituations arise in which evidence of other crimes is particularly material to a contested issue in the case. . . ."). In *Emory v. State,* 101 Md.App. 585, 647 A.2d 1243 (1994), *cert. denied,* 337 Md. 90, 651 A.2d 855 (1995), we stated that it was not enough that the evidence of other crimes, wrongs, or acts "be technically or minimally relevant to some formal issue in the case . . . but further 1) that the relevance be *substantial* and further still 2) that it be with respect to a *genuinely contested issue* in the case." *Id.* at 602, 647 A.2d 1243.

In *Emory,* the State sought to introduce the testimony of a witness about prior criminal acts committed by the defendants. The State argued that the testimony was specially relevant " 'to show the relationship between [the defendants and the witness] almost their entire adult lives.' " *Id.* at 597, 647 A.2d 1243. The defendants offered to stipulate that they had known the witness for several decades. The trial court nevertheless permitted the State to put on the evidence of the witness's involvement with the defendants and their prior criminal acts. We reversed, holding that the other crimes evidence was not admissible because it was not relevant to any contested issue.

The same reasoning applies in the case *sub judice.* A plaintiff in a lead paint premises liability case must prove that the defendant/landlord knew or had reason to know of the

existence of peeling, flaking, or chipping paint on the premises and that a landlord of ordinary intelligence and with the same knowledge as the defendant of the dangers associated with lead paint would realize the risk of lead poisoning created by that condition. *Brown v. Dermer*, 357 Md. 344, 362, 744 A.2d 47 (2000). Here, the first issue (Lewin's knowledge or reason to know of the existence of deteriorated paint) was contested; the second issue (Lewin's knowledge of the health hazards/risks of lead poisoning) was not contested. As we already have recounted, Mr. Sober testified in detail that as far back as the early 1980's he knew about the health dangers to children caused by lead paint. Because that issue was not genuinely contested, the violation notices could add no relevant information to it. *See Davis v. Goodman*, 117 Md.App. 378, 415, 700 A.2d 798 (1997).

■ The appellees suggest that the violation notices were specially relevant because they were probative of the extent of Lewin's knowledge of the general dangers of lead paint. They maintain that *how* Mr. Sober came to learn of the dangers of lead paint showed the *amount* of knowledge he had. While the trial court did not engage in an inquiry into special relevancy in ruling the notices admissible, it commented that the notices could be used by the appellees to "bolster" evidence of Mr. Sober's (and thus Lewin's) knowledge of the general dangers of lead paint. Mr. Sober's testimony made plain, however, that he had a full understanding of the health dangers of lead paint, and that his knowledge in this regard pre-dated the violation notices. Neither the fact of his knowledge of the dangers of lead paint nor the extent of that knowledge was at issue. The prior lead paint violation notices were not admissible to bolster proof of uncontested facts.

■ Whether Lewin knew or had reason to know of the existence of peeling, chipping, or flaking paint in the House was a central, contested issue. Lewin asserts that the prior lead paint violation notices were not specially relevant to that issue because the notices concerned the conditions of other properties at other times. The appellees respond that the

violation notices were substantially relevant to the issue of "whether Mr. Sober knew or had reason to know that defective lead paint existed at his property." We agree with Lewin that the notices were not probative of the presence of peeling, chipping, or flaking paint at the House when Sean was living there.

Preliminarily, as admitted into evidence, the violation notices state only that lead paint was found in the properties to which the notices pertain, and that children who frequented the properties were diagnosed with elevated blood lead levels. The notices do not state that there was peeling, chipping, or flaking paint (lead-based or otherwise) at the properties. Thus, the notices did not constitute proof of the existence of deteriorated paint at other properties managed by Mr. Sober or owned by Lewin or its predecessor companies. Moreover, the notices did not contain information showing that the conditions of those properties had caused the children who frequented them to sustain lead paint poisoning. At most, the notices constituted unproven allegations that the lead paint at the properties in question may have been in such condition as to have caused the elevated blood lead levels in the children referred to.[8]

Even if the prior lead paint violation notices could be construed as showing the presence of peeling, chipping, or flaking paint in the properties to which they pertained, and that Mr. Sober, upon receipt of the notices, had gained knowledge of those conditions, the notices were not probative of whether Lewin (through Mr. Sober) knew or had reason to know of the existence of peeling, chipping, or flaking paint at the property in this case, at the time relevant. Knowledge of a defective condition at a particular property cannot be ascribed to a landlord merely because he has general knowledge that other similar properties may contain such a condition, even when the time frame is the same. *Richwind Joint*

---

8. The testimony of the hearing inspector would seem to indicate that the lead paint detected at those properties could have been intact.

*Venture 4 v. Brunson,* 335 Md. 661, 677, 645 A.2d 1147 (1994). Lewin's knowledge, through Mr. Sober, that in the late 1980's other properties in Baltimore City contained deteriorated lead paint did not make it more likely that in 1991 and 1992 there was deteriorating lead paint in the House and/or that Lewin knew or had reason to know of that condition. To the extent that the violation notices had any probative value in this case (except as to the uncontested issue discussed *supra*), they were propensity evidence. From the fact that there was deteriorating paint in other Baltimore City properties that Mr. Sober managed, in the late 1980's, a fact-finder could conclude, albeit improperly, that he was the type of landlord who would allow his properties to become run-down and that he had done so with the House in this case as well.

■ At oral argument in this Court, the appellees asserted that the prior lead paint violation notices were specially relevant to the question of whether Lewin breached its duty of care. More specifically, they argued that the notices showed that Mr. Sober had prior experience observing peeling, chipping, and flaking paint; therefore, the notices were probative of whether Mr. Sober should have noticed peeling, chipping, or flaking paint during his "walk through" of the House.[9]

As discussed above, the notices stated only that the respective dwellings contained lead-based paint—not that the paint was peeling, chipping, or flaking. Therefore, the notices did not contain information showing that Mr. Sober had prior experience in observing peeling, chipping, or flaking lead paint. Moreover, the evidence adduced at trial was that Mr. Sober was inside the House during the "walk through" and, according to Sharon Parker, there was deteriorated paint throughout the premises when he was there. At no point during the proceedings was it ever suggested by either party that Mr. Sober's capacity to observe deteriorated paint, assuming it was present, was at issue. Because Mr. Sober's

**9.** The appellees did not include this argument in their brief. Nevertheless, we will exercise our discretion to address it.

ability to see peeling, flaking, or chipping paint was not contested, the violation notices were not admissible on that issue.

▆▆▆▆▆▆ Furthermore, this line of reasoning seems to imply that Lewin had a duty to inspect the premises and look for peeling, chipping, or flaking lead paint. It is well established in Maryland that a landlord is not under a duty to inspect the premises for dangerous conditions and to determine if repairs are necessary. *Richwind Joint Venture 4*, 335 Md. at 674–75, 645 A.2d 1147. Under both the common law and Baltimore City Code, Lewin's duty to repair the defect in the premises did not arise until it knew or had reason to know of the defective condition. *Id. See also* Baltimore City Code, Art. 13 § 301 *et seq.* (2000). The prior lead paint violation notices were not specially relevant to the issue of duty.

The violation notices did not satisfy the first prong of the *Faulkner* test. Because they constituted other bad act evidence that was not specially relevant to a contested issue in the case, they should have been excluded from evidence, under Md. Rule 5–404(b), as a matter of law.

▆▆▆▆▆▆ In a civil case, the appellant not only must demonstrate error, but also must show that the error caused prejudice. *Farley v. Allstate Ins. Co.*, 355 Md. 34, 47, 733 A.2d 1014 (1999); *Fish Market Nominee Corp. v. G.A.A., Inc.*, 337 Md. 1, 15, 650 A.2d 705 (1994); *Maryland Deposit Ins. Fund Corp. v. Billman*, 321 Md. 3, 34, 580 A.2d 1044 (1990). "Prejudice exists when the error influenced the outcome of the case." *Fish Market Nominee Corp.*, 337 Md. at 15, 650 A.2d 705 (citing *Harris v. David S. Harris, P.A.*, 310 Md. 310, 319, 529 A.2d 356 (1987)). Whether an error was prejudicial is determined on a case-by-case basis. *Billman*, 321 Md. at 17, 580 A.2d 1044.

In determining whether improperly admitted evidence ... prejudicially affected the outcome of a civil case, the appellate court balances " 'the probability of prejudice from the face of the extraneous matter in relation to the circumstances of the particular case....' " It is not the possibility,

but the probability, of prejudice which is the object of the appellate inquiry.

*Billman,* 321 Md. at 17, 580 A.2d 1044 (quoting *Harford Sands, Inc. v. Groft,* 320 Md. 136, 148, 577 A.2d 7 (1990) (quoting *Wernsing v. General Motors Corp.,* 298 Md. 406, 420, 470 A.2d 802 (1984))) (internal citations omitted).

■ The reason that Md. Rule 5–404(b) presumes exclusion for propensity evidence is that when used to show action in conformity such evidence usually is prejudicial. In the case *sub judice,* the nature of the evidence and the way it was used at trial made it likely that its admission prejudiced Lewin's defense. The violation notices showed that, on numerous occasions over a period of years, properties managed by Mr. Sober contained lead paint, such that public authorities suspected that children in those properties had suffered lead paint poisoning. In a case in which the primary factual questions for the jury to decide were whether there was deteriorated paint in premises managed by Mr. Sober and whether he knew of that condition, the jury was likely to conclude from the notices that because Mr. Sober knowingly had maintained houses with peeling, chipping, and flaking paint in the past, he probably had done so on this occasion as well.[10]

Moreover, the appellees' counsel sought to use the notices to their maximum prejudicial effect in his closing argument by telling the jury that Mr. Sober "had firsthand knowledge and firsthand experience of having children in his home before this one exposed to and poisoned by lead" and that "[a]ll of that knowledge he had, all of that experience he had is what you need to consider and evaluate in determining what conduct was required of Mr. Sober under the circumstances of this

---

**10.** Indeed, in response to Lewin's assertion, even if we were to analyze the admissibility of the prior violation notices under Md. Rule 5–403, we would conclude that whatever marginal relevancy they had was so far outweighed by their likelihood of being misused as propensity evidence that they would fail the "probative value versus prejudicial effect" balancing test as a matter of law.

case." [11] In effect, the appellees' counsel was asking the jury to use the violation notices for propensity purposes, and to find against Lewin on that basis. More than likely, the jury considered the notices in returning a verdict against Lewin. Accordingly, we conclude that the trial court's error in allowing the violation notices into evidence was prejudicial.

## II

Lewin contends that the trial court erred in allowing the appellees' vocational rehabilitation witness, Mark Lieberman, to testify as an expert on employment prospects for Sean, as a lead-impaired child, because he was not qualified in that area. It further contends that the court erred in permitting Mr. Lieberman to give opinion testimony about Sean's impairment of earning capacity, because his testimony was speculative, and in permitting Mr. Lieberman to testify about the value, in dollars, of Sean's lost earning capacity without reducing the damage figure to present value. The last two contentions were the subject of a motion *in limine* filed by Lewin and denied by the court.

### (i)

Lewin first argues that because Mr. Lieberman had no experience with employment prospects for lead-impaired children outside of a litigation context, the court should not have allowed him to testify as an expert witness on that subject. The appellees respond that the court was within its discretion in finding that Mr. Lieberman qualified as an expert in employment prospects for children affected by lead.

Md. Rule 5–702 governs the admission of expert testimony. It provides:

Expert testimony may be admitted, in the form of an opinion or otherwise, if the court determines that the testimony will assist the trier of fact to understand the evidence

---

**11.** At oral argument in this Court, appellees' counsel acknowledged that the violation notices were the sole basis for this closing argument.

or to determine a fact in issue. In making that determination, the court shall determine (1) whether the witness is qualified as an expert by knowledge, skill, experience, training, or education, (2) the appropriateness of the expert testimony on the particular subject, and (3) whether a sufficient factual basis exists to support the expert testimony.

Under this rule, trial courts have "wide latitude in deciding whether to qualify a witness as an expert or to admit or exclude particular expert testimony," and we review the trial court's decision for an abuse of discretion. *Massie v. State,* 349 Md. 834, 850–51, 709 A.2d 1316 (1998).

 In order to qualify as an expert, a witness "should have such special knowledge of the subject on which he is to testify that he can give the jury assistance in solving a problem for which ... average knowledge is inadequate." *Braxton v. Faber,* 91 Md.App. 391, 396, 604 A.2d 543 (1992) (quoting *Raitt v. Johns Hopkins Hosp.,* 274 Md. 489, 500, 336 A.2d 90 (1975)). *See also Oken v. State,* 327 Md. 628, 660, 612 A.2d 258 (1992). A witness may qualify as an expert as long as he has a minimal amount of competence relative to the area in which he purports to be an expert. *Wood v. Toyota Motor Corp.,* 134 Md.App. 512, 521, 760 A.2d 315 (2000), *cert. denied,* 362 Md. 189, 763 A.2d 735 (2000); *Naughton v. Bankier,* 114 Md.App. 641, 655, 691 A.2d 712 (1997). The trial court is entitled to consider any and all aspects of a witness's background in determining whether the witness qualifies as an expert on the subject matter. Objections to an expert witness's training, expertise, or knowledge go to the weight of the evidence, not its admissibility. *Braxton,* 91 Md.App. at 396, 604 A.2d 543 (citing *Baltimore Transit Co. v. Smith,* 252 Md. 430, 250 A.2d 228 (1969)).

 In the case at bar, Mr. Lieberman testified that he holds a master's degree in rehabilitation counseling from Towson State University [12] and that he works as a vocational

---

12. Towson State University is now known as Towson University.

and career counselor. Specifically, he evaluates people with disabilities, assesses their skills-level and limitations, and attempts to locate appropriate employment for them. In the past, Mr. Lieberman had worked in the Maryland Department of Education, Division of Vocational Rehabilitation, Disability Determination Services Unit, evaluating whether applicants for Social Security disability benefits were "disabled," under the Social Security Act.[13] In doing so, he evaluated each applicant's medical records, educational history, and employment history to determine if employment was available for him. Also in the past, Mr. Lieberman had worked as a vocational counselor in Baltimore City for the Maryland Department of Education, finding job placements for people with developmental disabilities, physical limitations, and psychological impairments.

Mr. Lieberman also had experience rendering private vocational counseling services for people disabled in workplace accidents and helping potential employers analyze the physical, educational, and mental requirements necessary for specific positions. He testified that he had worked on approximately 5,000 cases, and nearly every case required him to assess an individual's educational capacities based on the individual's disability. Also, he had worked with at least two to three thousand clients with cognitive disabilities similar to Sean's and, in all of those cases, he had performed a vocational evaluation, including an assessment of the client's academic capacity.

On cross-examination, Mr. Lieberman acknowledged that although 25 to 40 percent of his work for the State involved projecting the vocational abilities of children under twelve years of age, none of the work involved the exact same process

---

**13.** For the purposes of Social Security disability benefits, "disabled" is defined as an "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months. . . . To determine whether [an applicant is] able to do any other work, we consider [the applicant's] residual functional capacity and . . . age, education, and work experience." 20 C.F.R. § 404.1505(a) (2000).

for determining disability that he used to assess Sean. He also conceded that, in his position as a rehabilitation counselor for the State, he did not work with any children under age 17, and that he did not have any formal medical training, but relied on independent medical reports in making his evaluations. He acknowledged that he was not an expert in the field of special education and that his expertise in projecting a child's educational capacities came from work done in the context of litigation, as part of his job with a private rehabilitation firm.

At the conclusion of the *voir dire* examination on Mr. Lieberman's qualifications, the trial court found that the witness qualified as an expert in the field of vocational counseling, under Md. Rule 5–702. The court concluded that Mr. Lieberman's experience and education gave him special knowledge of the subject beyond the experience of the jurors and that his opinion would assist the jury in determining the extent of the impairment of Sean's earning capacity.

In *Oken, supra,* 327 Md. 628, 612 A.2d 258, a witness who worked for the FBI was called by the State to testify about a comparison he made of a piece of rubber found in the victim's apartment to a tennis shoe found in the defendant's apartment. The witness detailed his training and experience with the FBI and explained that while he had performed "torn-edge" comparisons of paper, tape, plastic, and matches in the past, he had never before performed a "torn-edge" comparison of rubber. The witness stated that the technique for "torn-edge" comparisons of rubber is the same as that used for other "torn-edge" comparisons. The trial court accepted the witness as an expert in the field of "torn-edge" comparisons. On appeal, the defendant argued that the witness should not have been qualified as such. The Court of Appeals held that the trial court did not abuse its discretion in qualifying the witness as an expert. The Court noted that even though this was the witness's first "torn-edge" comparison of rubber, because he had experience using the same "torn edge" technique for other comparisons, he was reasonably qualified to give expert testimony on the topic. *Id.* at 660–61, 612 A.2d 258.

The case at bar is analogous to *Oken.* Although Mr. Lieberman acknowledged that he had never before used the exact process he used to evaluate Sean on another child under the age of twelve, the assessment process he used for Sean was the same one that he used for his vocational clients. Although he may not have used this precise process to evaluate a child under the age of twelve, he was, like the witness in *Oken,* amply experienced in the use of this type of analysis. In addition, he had experience evaluating other children under the age of twelve. The trial court did not abuse its discretion in determining that Mr. Lieberman qualified as an expert witness.

### (ii)

Lewin next asserts that the trial court erred in permitting Mr. Lieberman to opine that Sean's physical and mental impairments due to lead exposure had caused him to sustain an impairment of earning capacity. Specifically, Lewin argues that, "[w]ith absolutely no history of working, without observing the infant Plaintiff as an adult, and in light of the numerous forces that could intervene before the infant Plaintiff enters the work force, the opinions expressed by Mr. Lieberman [were] simply too speculative to constitute a valid award of damages."

Future damages must be established with reasonable certainty, and must not rest upon speculation or conjecture. *Pierce v. Johns–Manville Sales Corp.,* 296 Md. 656, 666, 464 A.2d 1020 (1983); *Naughton,* 114 Md.App. at 657, 691 A.2d 712. Future damages cannot be recovered if the future consequences upon which the damages are premised are merely possibilities. *Pierce,* 296 Md. at 666, 464 A.2d 1020. Sufficient probability exists when there is more evidence in favor of a proposition than there is against the proposition. *Id.*

Lewin relies on *Kujawa v. Baltimore Transit Co.,* 224 Md. 195, 167 A.2d 96 (1961), to support its argument on this issue. In *Kujawa,* a child was injured when the car in which he was riding was hit by a transit bus. The child was hospitalized for

six days for a fractured skull and a concussion. At trial, several years after the accident, the child's doctor testified that the child still had headaches and dizziness from the accident. The doctor went on to say, however, that the future effect of the injuries on the child was too indefinite for him to give an opinion about. Notwithstanding this testimony, the child sought to recover damages for impairment of earning capacity. The trial court concluded that there was no legally competent evidence to show impairment of earning capacity, and refused to instruct the jury on that basis. That ruling was challenged on appeal. The Court of Appeals affirmed, stating:

> The contention is not worthy of extensive consideration. Even if we assume the correctness of the proposition that a nine-year old boy may be entitled to damages for the impairment of his capacity to earn a livelihood after reaching his majority, it would not be applicable here. In addition to the fact that there is nothing to substantiate the claim—the record does not show that he has ever earned anything and it is impossible to foretell without speculation what his earning capacity may be in the future—there is also no evidence to support the claim of "impairment." Just as there was no legally sufficient evidence to establish permanency of the injuries, there is likewise no legally competent evidence to show impairment of earning capacity.

*Id.* at 207–08, 167 A.2d 96.

Lewin seizes on the language of the Court in *Kujawa* to argue that without a track record of employment, which did not exist in this case because Sean is still a child, an award of damages for impairment of earning capacity necessarily is speculative. We disagree. First, *Kujawa* is distinguishable from the case *sub judice.* There, the plaintiff presented no evidence whatsoever to show that the child had suffered impairment of earning capacity. The plaintiff's expert medical witness was unable to state an opinion as to the permanency or future consequences, if any, of the injury to the child. In this case, by contrast, two expert witnesses, Dr. Barry Hurwitz, Ph.D, and Dr. Howard Klein, M.D., testified that Sean

had suffered brain damage from his exposure to lead paint and that the brain damage was permanent. Furthermore, they both testified that, as a result of the brain damage, Sean had trouble with organization, sustaining attention, following directions, and controlling his behavior.

Second, much more recently, in *Anderson v. Litzenberg*, 115 Md.App. 549, 694 A.2d 150 (1997), we addressed the evidence required for a plaintiff to recover damages for impairment of earning capacity and rejected an argument analogous to the one Lewin advances. Judge Harrell, writing for the Court, explained that impairment of earning capacity is the plaintiff's loss of his capacity to earn; it is not his loss of sums that he would have earned in the future, *i.e.*, lost future wages. 115 Md.App. at 572–73, 694 A.2d 150; *see also Monias v. Endal*, 330 Md. 274, 623 A.2d 656 (1993). Once the plaintiff has presented evidence to establish, to a reasonable degree of probability (*i.e.*, more likely than not) that his earning capacity has been impaired as a result of the defendant's wrongful conduct, he then must submit evidence "so that the extent of the impairment can reasonably be determined." The proper measure of damages for impairment of earning capacity

> is the difference between the amount that the plaintiff was capable of earning before his injury and that which he is capable of earning thereafter. Essentially, the plaintiff must establish the disparity between the market value of his services before and after the injury.

115 Md.App. at 573, 694 A.2d 150.

The plaintiff in *Anderson*, who had been injured in an automobile accident, was a twenty-two-year-old self-employed construction renovation worker. He had sought damages for loss of earning capacity, even though his construction renovation business had not turned a profit in the four years that it had been in existence. At trial, the defendant argued that there was not sufficient evidence of a track record of earnings for the plaintiff's business to permit the jury to award damages for impairment of earning capacity. The trial court

disagreed, and sent the issue to the jury, which found for the plaintiff and awarded him damages of that type.

 In affirming the trial court's decision, this Court held that evidence of a track record of earnings by the plaintiff's business was not a necessary underpinning for an award of damages for impairment of earning capacity. The business's losses could have resulted from phenomena unrelated to the plaintiff's earning capacity. More important for our purposes is the following observation by Judge Harrell:

> Because impairment of earning capacity is not measured by what the claimant actually earned, it follows that a plaintiff can recover for impairment of earning capacity without establishing a prior track record of earnings.

115 Md.App. at 575, 694 A.2d 150. Among the numerous out-of-state cases cited in support of this proposition are several allowing recovery of damages for loss of earning capacity by an infant or child. *See Callaway v. Miller,* 118 Ga.App. 309, 163 S.E.2d 336 (1968) (school child); *Lesniak v. County of Bergen,* 117 N.J. 12, 563 A.2d 795 (1989) (infant); *Kavanaugh v. Nussbaum,* 71 N.Y.2d 535, 528 N.Y.S.2d 8, 523 N.E.2d 284 (1988) (newborn); *Doremus v. Atlantic, C.L.R. Co.,* 242 S.C. 123, 130 S.E.2d 370 (1963) (child).

Generally, courts in other jurisdictions have held that recovery for impairment of earning capacity of a minor will not be precluded simply because the injured child has no history of earnings. *See* 22 Am.Jur.2d *Damages* § 191 (1988). In *Virginian Ry. Co. v. Armentrout,* 166 F.2d 400 (4th Cir.1948), a locomotive backed over and severed portions of a thirteen-month-old infant's arms and hands. The Fourth Circuit recognized that damages for impairment of earing capacity would be difficult to determine in a case involving a very young child who had no history of earnings upon which an award could be based. Nevertheless, it held that such damages could be awarded (although it concluded that the lower court had awarded damages that were excessively high). The court stated:

The problem of assessing damages in a case of this sort is one which must be approached with common sense. The little child has been terribly injured; but there is nothing from which loss of earning capacity can be estimated with any degree of accuracy. The jury must do the best it can to estimate this, taking into account, of course, such matters as average earnings. They can consider, also, that the child is bright and intelligent. . . .

*Id.* at 407.

Other courts also have found that future damages for lost earning capacity were sufficiently certain, even though the plaintiff was an infant with no history of earnings. *See, e.g. McNeill v. United States,* 519 F.Supp. 283 (D.S.C.1981) (stating that it was irrelevant that the child, who was ten months old when he was injured, was unable to show a history of earnings on which to base his claim for damages for impairment of his earning capacity); *Steeves v. United States,* 294 F.Supp. 446, (D.S.C.1968) (addressing the impairment of an eleven year old child's earning capacity and stating that, because there was every reasonable and probable certainty that the child's physical disability would have a detrimental effect on his future earning capacity, the child was entitled to damages, despite some uncertainties as to the future).[14]

---

**14.** In *Bankert v. United States,* 937 F.Supp. 1169 (D.Md.1996), in which a four-year-old child was suffering from a form of cerebral palsy sustained as a result of the defendant's negligence during her birth, the court held that the evidence did not establish with reasonable certainty what the child's future medical condition would be. In assessing the evidence of the child's future economic damages in general, the court stated that the difficulty in assessing those damages came from the fact that it was unclear what would happen to the child in the future. *Id.* at 1185. It noted that, at best, the evidence showed that the child was only "at risk" for future developmental problems and that the child had made continued improvement as a result of early interventions. The court focused on the certainty, or lack thereof, of the child's future medical difficulties.

The case at bar is distinguishable from *Bankert.* There, the court focused on the uncertainty of the future of the child's affliction. The evidence here established with reasonable certainty that Sean is suffering from developmental disabilities that are permanent and continuing.

Although courts generally agree that an infant can be awarded damages for loss of earning capacity, not all courts agree on what will suffice to make proof of lost earning capacity "reasonably certain." Some courts, it appears, are willing to accept purely statistical data; other courts require an individualized basis for the damages. *Compare McNeill,* 519 F.Supp. at 290, *with Bulala v. Boyd,* 239 Va. 218, 389 S.E.2d 670, 677 (1990).

In *Bulala, supra,* 239 Va. 218, 389 S.E.2d 670, the plaintiff was a female child who had sustained severe injuries at birth as a result of the defendant's negligence. Expert testimony established that she had cerebral palsy and would never be able to walk or function beyond the mental capability of a one-year old. On the issue of lost earning capacity, the plaintiff presented the testimony of an economist, who calculated her loss based on statistics for the median income for women in that geographic area multiplied by the average national work life expectancy. *Id.* The Supreme Court of Virginia held that, although the plaintiff was not precluded based on her age alone from recovering damages for impairment of earning capacity, statistical averages, alone, were not sufficient to establish damages with reasonable certainty. *Id.* at 677–78. Rather, the "evidence must be grounded upon facts specific to the individual whose loss is being calculated." *Id.* at 677.

In the case *sub judice,* the evidence of Sean's lost earning capacity was not premised solely on general statistical data. Mr. Lieberman's opinion rested on facts personal to Sean as an individual. He considered Dr. Hurwitz's neuropsychological evaluation of Sean, the medical report of Dr. Klein, Sean's school and health records, and information provided by Sean's mother and grandmother. He also took into account Sean's achievement of developmental milestones and his mother's work and educational background. From this information and his own expertise, Mr. Lieberman formed opinions about Sean's educational and vocational future. He concluded that, without the mental disabilities from lead exposure, it was probable that Sean would have in the future attained an

education level of between 9th and 12th grade, and would have been employable in jobs requiring organizational and oversight skills. He further concluded that given Sean's lead impairments, it was more likely than not that he would drop out of school at the age of 16 and would not complete a 9th grade education, and that he only would be employable for "very basic manual labor." Finally, relying on statistics from the Department of Commerce, Mr. Lieberman opined that Sean's earning capacity was less than what it would have been had he not been injured.

Notwithstanding that Sean had no work history or track record of employment, the combination of evidence specific to Sean and general to the population that was adduced at trial was such as to permit a reasonable finding that, more likely than not, Sean's future earning would be less than it would have been if he were not injured. The evidence was reasonably certain and was not based on speculation or conjecture.

### (iii)

At trial, Mr. Lieberman opined that the value of Sean's lost earning capacity was $369,107. He did not spell out how he arrived at that figure. After stating his conclusion that Sean would be employable only in basic jobs, suitable to males not having completed 9th grade, instead of in jobs that males at the 9th to 12th grade education level could perform, Mr. Lieberman testified that Sean likely will have a 52–year work-life (from age 18 to age 70) and that, over the course of that work-life, he probably will earn $369,107 less than he would have earned had he not been injured by exposure to lead paint.[15]

The numbers that Mr. Lieberman used to arrive at this sum are contained in a report that he prepared before trial and testified about in deposition. The report was not moved into

---

**15.** Mr. Lieberman also opined that it was likely that Sean would be unemployed for half of his work-life, due to his injuries. Nevertheless, he assumed a full work-life for Sean, on the theory that that was a conservative estimate of damages.

evidence at trial but is in the record because it was attached to Lewin's motion *in limine.* The numbers are Department of Commerce statistics reflecting that in 1996 the cumulative earnings of a 70–year–old male with a 9th to 12th grade education totaled $1,393,437, while those of a 70 year old male with less than a 9th grade education totaled $1,024,330. The difference between those numbers is $369,107.[16] In essence, Mr. Lieberman's opinion was that the pertinent cumulative income differential that has existed in years past will remain constant and carry into the future, and fairly represents the loss that Sean will sustain over his projected 52–year work-life.

Mr. Lieberman did not reduce the $369,107 figure to present value, either in his report or when he testified at trial, even though it was clear from his testimony that this loss would be incurred over time. He did not give any economic testimony at all.[17] The appellees did not call an economist or introduce any economic evidence about the present value of Mr. Lieberman's $369,107 quantification of Sean's lost earning capacity. Lewin did not present any such evidence or any valuation of damages evidence at all. Finally, there were no proffers or stipulations about calculating present value.

In its motion *in limine,* Lewin took the position that damages for lost earning capacity must be reduced to present value, that evidence of present value is essential proof for that item of damages, and that, in the absence of such proof, Mr. Lieberman's opinion about the value of that loss was not competent and should have been excluded. The trial court denied the motion. Lewin renewed its objection on the same basis when Mr. Lieberman testified at trial.

---

**16.** The report also mentions that the income differential for 22 year old males at the two education levels is 91 cents an hour. The report does not calculate cumulative work-life earnings based on that figure because, according to Mr. Lieberman, the income gap in Sean's case will increase with time, as he is ruled out of opportunities for advancement as a result of his disabilities.

**17.** According to the motion *in limine,* Mr. Lieberman testified in deposition that he was not qualified to give an opinion about present value.

At the close of all of the evidence, Lewin moved for judgment on the issue of damages for lost earning capacity, on the bases that Mr. Lieberman's testimony was speculative and without foundation and that the appellees had not presented competent evidence to support such a damages award. The trial court denied the motion, and instructed the jury that damages could be awarded for "the loss of earning capacity reasonably probable to be expected in the future." Lewin objected to the instruction on the ground that there was an insufficient foundation for recovery of damages of that sort. It does not appear from the record that Lewin asked the court to instruct the jury on present value.

In closing argument, counsel for appellees said that Mr. Lieberman's estimate of $369,107 in future lost wages was a conservative, minimum figure, given that Sean likely would have substantial periods of unemployment due to his disabilities, and suggested that the jury award $600,000 for that item of damage.

The jury returned an award that included $500,000 for lost earning capacity.

Lewin contends that the trial court erred in allowing Mr. Lieberman to testify about a figure for loss of earning capacity for Sean without requiring him to reduce the figure to present value. It argues, in essence, that without such testimony, the appellees' proof on the issue was incomplete, and should not have been submitted to the jury. The appellees reply that they did not bear the burden of producing present valuation evidence; rather, Lewin, as the defendant, had that burden.

Irrespective of the absence of a present valuation calculation in Mr. Lieberman's testimony, his opinion quantifying the amount of Sean's loss of earning capacity was not supported by any factual basis that could be weighed and considered by the jury. For the reasons we have explained, there was a basis in the evidence for Mr. Lieberman's opinion that Sean's lead paint injuries would negatively affect his capacity to learn and become educated and his ability to obtain and engage in employment. Mr. Lieberman gave no explanation to the jury,

however, about how he came to assign the $369,107 figure to Sean's loss of earning capacity. There simply was no basis for that number in the evidence, and therefore no means for the jury to assess its validity or merit.[18] Mr. Lieberman should not have been permitted to give an opinion about a dollar figure to measure Sean's lost earning capacity without any testimony showing the basis for calculating that dollar figure. *See Lumber Terminals, Inc. v. Nowakowski*, 36 Md.App. 82, 95, 373 A.2d 282 (1977) (observing that economic expert witness can testify about the effect of inflation on future earnings so long as there is an evidentiary basis in the record for that testimony).

With respect to the issue of present value evidence, in *Chesapeake and Ohio Railway Co., v. Kelly*, 241 U.S. 485, 36 S.Ct. 630, 60 L.Ed. 1117 (1916), the Supreme Court explained the reason for reducing to present value damages that are awarded for the loss of future benefits:

> So far as a verdict is based upon the deprivation of future benefits, it will afford more than compensation if it be made up by aggregating the benefits without taking account of the earning power of the money that is presently to be awarded. It is self evident that a given sum of money in hand is worth more than the like sum of money payable in the future.

*Id.* at 489, 36 S.Ct. 630.

Few Maryland cases have addressed the issues of how damages for lost future benefits are to be quantified, which party, if either, bears the burden of producing evidence of present value, and the consequences of not producing such evidence.

In *Walston v. Sun Cab*, 267 Md. 559, 298 A.2d 391 (1973), the Court of Appeals held that in a wrongful death case in which economic evidence about present valuation had been introduced, it was reversible error for the trial court to refuse

---

18. Again, we could determine from Mr. Lieberman's report the figures he used to calculate the loss. That report was not in evidence, however, and the figures were not put before the jury.

to instruct the jury to reduce any award it might give for lost future earnings to present value, using a discount factor to be decided by it.

In *Dennis v. Blanchfield,* 48 Md.App. 325, 428 A.2d 80 (1981), *mod. on other grounds sub nom. Blanchfield v. Dennis,* 292 Md. 319, 438 A.2d 1330 (1982), this Court determined that the Court of Appeals would apply this present valuation rule to damages for loss of future benefits in personal injury actions as well. In that case, there was no economic evidence introduced about present valuation. We held that the trial court committed reversible error when it refused to instruct the jury to reduce to present value any damages it awarded for loss of future earnings. In so doing, we noted that "[i]n the absence of expert testimony, the trial court could, of course, require counsel requesting the instructions to produce appropriate tables before the matter could be judicially noticed." 48 Md.App. at 333 n. 5, 428 A.2d 80.

The Court of Appeals took *certiorari* in *Dennis v. Blanchfield* and vacated the judgment of the circuit court on other grounds. Because it was not clear that the issue of future lost earnings would arise on remand, it chose not to address it.[19] The Court mentioned, however, "without comment to its necessity," that the defendant, who was the party on appeal complaining about the trial court's failure to give a present value instruction, "did not proffer any evidentiary basis, expert or otherwise, to underpin his requested present value instruction." 292 Md. at 322 n. 3, 438 A.2d 1330.

Several years later, in *Baublitz v. Henz,* 73 Md.App. 538, 535 A.2d 497 (1988), this Court reiterated that if presented with the issue the Court of Appeals would hold that it is reversible error in a personal injury case to refuse to instruct the jury that damages for loss of future earnings must be reduced to present value. *Baublitz* was a personal injury automobile tort action in which the plaintiff was awarded

---

**19.** At one point during the trial, the plaintiff had asserted that she was not making a claim for future lost earnings. 48 Md.App. at 334, 428 A.2d 80.

substantial damages for future lost earnings. No expert or other economic evidence was presented at trial. Mindful perhaps of the Court's admonition in *Blanchfield,* we affirmed the judgment for compensatory damages, holding that the trial court did not err when it declined to give a present valuation instruction in the absence of any evidence "as to its proper application." *Baublitz,* 73 Md.App. at 550, 535 A.2d 497. In so doing, we expressly referenced and adopted the reasoning of the Fourth Circuit in *Aldridge v. Baltimore and O.R.R.,* 789 F.2d 1061, 1067–68 (4th Cir.1986), *aff'd,* 814 F.2d 157 (4th Cir.1987) (en banc), *vacated and remanded, sub nom. Chesapeake & O.R.R. v. Aldridge,* 486 U.S. 1049, 108 S.Ct. 2812, 100 L.Ed.2d 913 (1988) (*"Aldridge I "*), in which that court concluded that when damages for lost future benefits are sought, the defendant bears the burden of producing evidence to support a present value instruction

In *Aldridge I,* the plaintiff in a FELA case was seeking damages for future lost earnings, which he calculated by aggregating his likely average earnings for seven years, until he would have retired at age 65. He did not present evidence of a discount rate or any directions that the jury could follow to reduce that aggregate sum to present value. The defendant moved for a mistrial on the ground that by failing to introduce evidence reducing his projected future lost income to present value, the plaintiff had presented inaccurate damages evidence. The trial court denied the motion, and denied a subsequent request by the defendant to instruct the jury to reduce any award for future lost earnings to present value.

On appeal, the Fourth Circuit observed that while, under federal law, it is error for the trial court to refuse to receive present value evidence of future lost earnings or to refuse to instruct the jury about reducing such an award to present value, that principle must be applied "consistent[ly] with the tenet that instructing the jury on a theory which is unsupported by the evidence presented at trial is also error." 789 F.2d at 1066. The court characterized the issue as whether reduction to present value is "an indispensable element of the plaintiff's claim for future lost wages which he must always

prove by specific evidence." *Id.* at 1067. If so, the plaintiff bears the burden of producing evidence of present value and, in the absence of such evidence, cannot recover damages of that sort. If not, the plaintiff can "sufficiently prove[ ] his claim by evidence of the gross amount of those lost wages," and it is up to the defendant to present evidence to reduce the claimed lost wages to present value. *Id.*

The panel majority adopted the latter approach, holding that the burden of producing economic evidence for the jury to use to reduce future lost wages to present value is on the defendant, who will benefit from application of the evidence. It held, moreover, that the burden of producing economic evidence for the jury to use to increase the claimed future lost wages, on account of inflation, is on the plaintiff, who will benefit from application of that evidence. If neither party presents evidence of that sort, the claim goes to the jury nonetheless, and the trial court is not required to give a present value instruction. In this holding, which followed the approach to present valuation adopted by the Ninth Circuit in *Alma v. Manufacturers Hanover Trust Co.,* 684 F.2d 622 (9th Cir.1982), the panel majority implicitly recognized that present valuation is not an essential element of the plaintiff's damages case, and, therefore, the risk of non-production falls on the defendant.

One judge in *Aldridge I* wrote a concurring opinion stating that, in his view, reduction of future lost earnings to present value is a material element of the plaintiff's claim, not in the nature of an affirmative defense, and that if the plaintiff fails to offer such proof, the claim should not be submitted to the jury. He joined in the decision of the majority because the defendant had waived the issue for appeal by not moving for judgment on damages on that ground.

When *Baublitz* was decided, *Aldridge I* had been affirmed by the Fourth Circuit sitting *en banc.* 814 F.2d 157 (4th Cir.1987). Thereafter, the Supreme Court vacated and remanded *Aldridge I* for reconsideration in light of *Monessen S.R. Co. v. Morgan,* 486 U.S. 330, 108 S.Ct. 1837, 100 L.Ed.2d

349 (1988). *Monessen* also was a FELA case. Unlike *Aldridge I*, it was tried in a state court. When the trial court instructed the jury on damages, it directed the jurors that in making an award for future lost earnings, they were to apply the rule of the forum state, which presumed a "total offset" of the discount rate and the inflation rate. The Supreme Court held that given that federal substantive law dictates that damages in personal injury cases should be reduced to present value, it was error for the trial court to refuse to instruct the jury that present value is the proper measure of damages for future lost earnings. *Monessen,* 486 U.S. at 340–42, 108 S.Ct. 1837. The Supreme Court emphasized that a present value calculation is a question of fact to be decided by the trier of fact. *Id.* at 342, 108 S.Ct. 1837. It held that because trial courts are obligated to prevent proceedings on economic issues from becoming unnecessarily long and complicated, however, "[i]t is ... permissible for the judge to recommend to the jury one or more methods of calculating present value so long as the judge does not in effect pre-empt the jury's function." *Id.*

On remand, in *Aldridge II,* the Fourth Circuit overruled *Aldridge I.* 866 F.2d 111 (1989). It held that even though no economic evidence had been introduced at trial, a present value instruction was required, as a matter of federal substantive law, and the failure to give such an instruction was reversible error. Thus, the Fourth Circuit concluded, contrary to its position when *Baublitz* was decided, that when damages for lost future benefits are sought, neither party bears the burden of producing evidence of present value, and neither bears the risk of non-production. If the plaintiff fails to introduce present value evidence, he will not be precluded from recovering future lost earnings, and the court must instruct the jury that any such damages should be reduced to present value. The court may instruct the jury on methods to use, but cannot mandate that one method prevail. If the defendant fails to produce present value evidence, the court still will instruct the jury on present value.

The federal circuits are not in agreement on many issues relating to present valuation evidence. The Tenth Circuit, interpreting *Monessen* more narrowly than the Fourth Circuit, follows the rule set forth in *Aldridge I,* that when no evidence has been presented about a discount rate or about an inflation rate, the trial court need not give any present value instruction and the fact finder " 'must make a lump sum award that is not adjusted for either factor.' " *Miller v. Union P.R. Co.,* 900 F.2d 223, 226 (10th Cir.1990) (quoting *Alma v. Manufacturers Hanover Trust Co., supra,* 684 F.2d at 626). Thus, the Tenth Circuit places the burden on the defendant to produce evidence of a discount rate to be used to reduce future damages to present value. The Eleventh Circuit has adopted a somewhat similar approach. It follows the rule that if no evidence is offered by either party about the appropriate discount rate to be used to calculate present value, the parties shall be deemed to have acquiesced by their silence to the "total offset" method, and no present value instruction should be given. Eleventh Circuit Civil Pattern Jury Instructions § 5.1 (2000).

The Eighth and Sixth Circuits hold that a present value instruction must be given in the absence of evidence about the discount rate, but further hold that because most laypeople have the general knowledge sufficient to enable them to discount an award of future lost earnings to present value, the trial court need not give directions to the jury about how to perform a present value calculation. Thus, neither party bears the burden of producing evidence of a discount rate or a present value calculation, and the court need only instruct the jury that it must discount an award of future benefits to present value, without also instructing the jury how to do so. *See Duncan v. St. Louis—San Francisco R.R. Co.,* 480 F.2d 79, 87 (8th Cir.), *cert. denied,* 414 U.S. 859, 94 S.Ct. 69, 38 L.Ed.2d 109 (1973), and *Pennsylvania R.R. Co. v. McKinley,* 288 F.2d 262 (6th Cir.1961). *See also Brown v. Chicago & N.W. Transp. Co.,* 162 Ill.App.3d 926, 114 Ill.Dec. 165, 516 N.E.2d 320 (1987) (holding that in Illinois, it is not error for the trial court to charge the jury to reduce an award for

future lost benefits to present value in the absence of economic evidence, including present worth tables, to guide the jury's determination of present value). On the other hand, the Federal Circuit has observed that reducing future benefits to present value is a technical exercise that is not generally within the common knowledge and ability of laypeople to perform. *Schleier v. Kaiser Found. Health Plan,* 277 U.S.App.D.C. 415, 876 F.2d 174 (1989).

The Second Circuit takes an approach that is similar to the Eighth and Sixth Circuits; it specifies, however, that in instructing the jury on present value, the trial court should inform it that the historical "cleansed" discount rate is 2%, so that it will not apply a discount factor less than that. *See Ramirez v. New York City Off–Track Betting Corp.,* 112 F.3d 38, 41 (2d Cir.1997).[20]

The Third Circuit appears to be the only federal circuit that has adopted the view, expressed in the concurrence in *Aldridge I,* that proof of present value is a material element of the plaintiff's claim for loss of future earnings and, therefore, the consequence of not producing such evidence is that the plaintiff may not recover that item of damages. *DiSabatino v. National R.R. Passenger Corp.,* 724 F.2d 394 (3rd Cir.1984).

Because federal courts such as the Fourth Circuit have taken the view that, in the absence of expert testimony about present valuation, the trial court must instruct the jury to discount an award of future lost benefits to present value and give it guidance on how to do so, federal pattern jury instructions have been crafted for that purpose. Those instructions cover two situations: when expert witness evidence has been presented and when it has not. The latter instruction, which

---

**20.** The "cleansed" discount rate, as explained by the Court in *Ramirez,* is the discount rate that would apply even if there were no inflation. 112 F.3d at 41 (observing that " 'damages for loss of earnings that would have been received in the future must be discounted to reflect the fact that, even if there were no inflation, a dollar received today is worth more than the right to receive a dollar in the future' " (quoting *Oliveri v. Delta S.S. Lines, Inc.,* 849 F.2d 742, 746 (2d Cir.1988))).

is given with a present-worth table that the court has judicially noticed, tells the jurors, *inter alia:*

> In order to make a reasonable adjustment for the present use, interest free, of money representing a lump sum payment of anticipated future loss, the law requires that the jury discount, or reduce to present worth, the amount of the anticipated future loss, by taking (1) the interest rate or return which the plaintiff could reasonably be expected to receive on an investment of the lump-sum payment, together with (2) the period of time over which the future loss is reasonably certain to be sustained; and then reduce, or in effect deduct from, the total amount of anticipated future loss whatever that amount would be reasonable certain to earn or return, if invested at such rate of interest over which future period of time; and include in the verdict an award for only the present-worth—the reduced amount—of anticipated future loss.

3 Edward J. Devitt *et al., Federal Jury Practice & Instructions,* § 85.11 (4th ed.1987). At least two state courts have endorsed these pattern instructions and have held that when no expert witness testimony on present value has been presented, the court should use the pattern instruction to give the jury direction about how to arrive at a present value award. *Howard v. Sanborn,* 483 N.W.2d 796, 801–02 (S.D.1992); *Adkins v. Foster,* 187 W.Va. 730, 421 S.E.2d 271, 275–76 (1992).

Returning to the case at bar, Lewin urges a position that we implicitly rejected in *Baublitz,* that the majority in *Aldridge I* rejected, and that, among the federal courts, appears to be followed only by the Third Circuit: that proof of the present value of lost future benefits is an integral part of the plaintiff's claim that must be established in the plaintiff's case and that, in the absence of such evidence, damages of that sort may not be awarded. To be sure, there is logic to the argument. In virtually all tort actions in which lost future benefits might be awarded, damages are an essential element of the plaintiff's claim, and it is the plaintiff's burden to prove damages with a reasonable amount of certainty. Damages for lost future benefits are compensatory, *i.e.,* they should make

the plaintiff whole. *Weishaar v. Canestrale*, 241 Md. 676, 217 A.2d 525 (1966); *see also Franklin v. Mazda Motor Corp.*, 704 F.Supp. 1325, 1332 (D.Md.1989) (observing that cardinal principle underlying award of damages is to compensate). The time value of money is such that an award today of a lump sum for a loss that will take place over time, instead of a smaller award that, if invested conservatively, will produce the income stream that will be lost, may overcompensate the plaintiff for his loss. It would be sensible, therefore, to view present valuation as a necessary calculation that the plaintiff must perform to make his claim for future damages accurate. If so, the burden would be on the plaintiff to produce evidence by which his claim can be reduced to present value. Finally, a burden of production is only meaningful if the party assigned the burden bears the risk of non-production. Thus, the plaintiff who did not produce present value evidence would not be permitted to recover damages for future lost benefits.

Courts are reluctant to adopt this approach, however, because it would produce harsh results in many cases and it does not sufficiently credit the ability of jurors to assess overall damage awards that, while not calculated by precision science, nevertheless are fair and do not stray from their compensatory purpose. For every case involving claimed lost earnings or lost benefits for years into the future in which a host of complicating variables comes into play, there are many cases in which the claim is relatively simple and straightforward. *Aldridge I*, involving lost future wages over a period of seven years, is a good example. When the time frame involved is short and the sums in question are uncomplicated, jurors' general knowledge of the economy and common sense understanding of the time value of money will enable them to adjust their award to present value intuitively, without being told precisely how to do so. In such a case, to the extent that avoiding overcompensation or inaccuracy in damages awards is the goal, the benefit of requiring the plaintiff to produce economic evidence on present valuation is low and the burden of such a requirement may be substantial. A rule that denies the plaintiff compensation for future lost benefits in such a

case because he did not offer economic evidence of present valuation would be harsh.

In addition, while the time value of money is "self evident," as the Supreme Court has observed, there are numerous economic approaches that can be taken to projecting lost income in the future and reducing the projected sum to present value, not all of which will produce a present value number that is very different from the aggregate gross lump sum loss number. In some cases, an expert witness may conclude that upward trends, such as inflation, and downward trends, such as discounting, balance each other so that there is a "total offset." If so, the aggregate lump sum of future losses and the sum of money needed at present to produce a replacement income stream are the same. It also would be harsh to require a plaintiff, at the risk of losing his claim for future lost benefits, to present economic evidence, usually in the form of expert witness testimony, merely to explain why discounting is offset by inflation, and that the aggregate loss need not be reduced.

For these reasons, we decline to adopt the position that a plaintiff must produce evidence of present value at the risk of having his claim for lost future earning capacity taken from the jury. We also are not persuaded, however, that it makes sense to place the burden on the trial court to explain, in instructions, not only that such an award must be reduced to present value but also the means by which to do so. The federal pattern jury instructions devised for that purpose are complicated and, in cases that are not straightforward, need fine-tuning for variables the parties may be disputing. Having the trial court instruct the jury about discount rates and other economic variables not in evidence and not stipulated to will inject the court unnecessarily and improperly into the fact-finding province of the jury.

Accordingly, we hold that, in a simple and straightforward case, in which the trial court ascertains that it is within the ordinary knowledge of laypeople to reduce an award of future lost earning capacity to present value, the trial

court must instruct the jury to reduce the award to present value when requested to do so. By contrast, when the plaintiff is seeking damages for lost future earning capacity and, in the trial court's assessment, the facts of the case are not so simple and straightforward as to allow ordinary laypeople to reduce such an award to present value by use of their general knowledge of economic variables, the defendant bears the burden of producing present valuation evidence. When the proper evidentiary foundation has been laid, the defendant will be entitled to an instruction telling the jury to reduce any such award to present value.[21] Likewise, in such a case, the plaintiff has the burden of producing economic evidence about which he seeks to have the trial court instruct the jury. In deciding whether the claim for future lost earning capacity is of a simple and straightforward nature, the trial court should consider factors such as the length of time over which the future lost benefits are being claimed, the nature of the benefits, and the variables affecting the benefits over time.

## III

Lewin also asserts that the trial court erred in denying its motion for summary judgment on the issue of Lewin's "reason to know" of the presence of deteriorated lead paint on the premises. Specifically, Lewin contends that when the motion was ruled upon, there was no evidence that it had been put on notice of the presence of deteriorated paint at the House before Sean sustained his injuries; accordingly, there was no genuine dispute of material fact, and it was entitled to judgment. The appellees respond that the trial court correctly denied Lewin's motion for summary judgment because there was a genuine dispute of material fact as to whether Lewin had "reason to know" of the presence of deteriorated lead paint on the premises.

---

21. The defendant can satisfy the burden either by producing his own evidence or eliciting evidence on cross-examination of a plaintiff's witness.

A motion for summary judgment may only be granted if there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law. Md. Rule 2–501(e); *Bowen v. Smith*, 342 Md. 449, 454, 677 A.2d 81 (1996). When a trial court grants a motion for summary judgment, we review its decision for legal correctness. *Id.; Heat & Power Corp. v. Air Prods. & Chems. Inc.*, 320 Md. 584, 591, 578 A.2d 1202 (1990); *Chaires v. Chevy Chase Bank, F.S.B.*, 131 Md.App. 64, 88, 748 A.2d 34, *cert. denied*, 359 Md. 334, 753 A.2d 1031 (2000). When, however, a trial court denies a motion for summary judgment on the ground that there are material facts in genuine dispute and the case proceeds to be determined on its merits, we review the court's denial of a summary judgment for an abuse of discretion. *Metropolitan Mortgage Fund, Inc. v. Basiliko*, 288 Md. 25, 29, 415 A.2d 582 (1980); *see also Presbyterian Univ. Hosp. v. Wilson*, 99 Md.App. 305, 311–15, 637 A.2d 486 (1994), *aff'd*, 337 Md. 541, 654 A.2d 1324 (1995).

The appellees responded to Lewin's motion for summary judgment by presenting to the court deposition testimony of Shirley Parker in which she stated that there was deteriorated and chipping paint on the doorway of the House and that Mr. Sober had been at the house when this condition was evident and before Sean sustained his injuries. Because there was a genuinely contested issue over whether Mr. Sober had seen and was on notice of the existence of deteriorated paint at the house, the court did not abuse its discretion in denying Lewin's motion for summary judgment.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY REVERSED AND CASE REMANDED FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY APPELLEES.**